**Lorraine A. BEATTY, Appellant,**

v.

**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY.**

**No. 87–7043.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 7, 1988.

Decided Nov. 4, 1988.

Neil Intrater, Washington, D.C., for appellant.

Gerard J. Stief, Asst. General Counsel, with whom Sara E. Lister, General Counsel, and John G. Elligers, Associate General Counsel, Washington, D.C., were on the brief, for appellee. Jeanette J. Leonard, Washington, D.C., also entered an appearance for appellee.

Before BUCKLEY and WILLIAMS, Circuit Judges, and EDWARD D. RE,* Chief Judge, U.S. Court of International Trade.

Opinion for the court filed by Chief Judge RE.

RE, Chief Judge:

Appellant, Lorraine A. Beatty, brought this action claiming damages for trespass to real property and nuisance resulting from the operation of subway trains by appellee, Washington Metropolitan Area Transit Authority (WMATA). She appeals from an order of the United States District Court for the District of Columbia which granted WMATA's motion for summary judgment. Having concluded that the trespass and nuisance were permanent in nature, the district court held that the action was barred by the three-year statute of limitations.

Beatty contends that the district court erred in granting summary judgment because there is a factual dispute as to whether the nuisance is permanent or continuing.

WMATA responds that the Metrorail system is permanent, as a matter of law, because it represents a public project operated by a governmental agency. In the alternative, WMATA contends that the activities in issue arose out of the performance of a "governmental" function for which it is immune under section 80 of the WMATA Compact.

The questions presented are: (1) whether the district court erred in holding that Beatty's action was time barred because the nuisance, as a matter of law, was permanent; and (2) whether WMATA, as a quasi-governmental agency, is immune from liability on tort claims resulting from the operation of its Metrorail system.

On the record presented, we hold that there are genuine issues of material fact, suitable for a trier of fact, as to whether the nuisance was permanent or continuing in nature, and as to whether the challenged activities arise out of the performance of a "governmental" or "proprietary" function of WMATA. Accordingly, the grant of summary judgment by the district court is reversed, and the case is remanded.

## I. BACKGROUND

Beatty is the owner of a house located on the corner of Girard and Ninth Streets, N.E., Washington, D.C. WMATA is an agency and instrumentality of Maryland, Virginia, and the District of Columbia empowered to plan, develop, finance and operate a regional transit system pursuant to the WMATA Compact. *See* Pub.L. No. § 293(a).

---

* Sitting by designation pursuant to 28 U.S.C.

89–774, 80 Stat. 1324 (1966) (codified as amended at D.C. Code Ann. §§ 1–2431—1–2436 (1981)). Beatty's house, in which she has lived since 1952, is situated across the street from a retaining wall which separates the Metrorail "B" Route (Red Line) from Ninth Street. This section of the Red Line, which runs 65 to 80 feet from Beatty's house, opened for service on February 6, 1978, after "test trains" were run along that route for several weeks prior to its opening.

In a letter to WMATA dated February 2, 1978, Beatty complained that the vibrations caused by the passing trains caused damage to her house. Specifically, she stated that the walls cracked, and that, whenever the trains passed by, the cabinets and dishes shook.

On January 31, 1986, Beatty sued WMATA, seeking $200,000 in damages under each count for damage to real property, trespass to realty, and nuisance. In her complaint, Beatty alleged that the vibrations from passing trains "caused and will continue to cause excessive cracking and spalling of the plaster and walls and ceiling of the house," and, thus, "greatly reduced its value." Stating that the "nuisance has been of a continuous nature," Beatty also alleged that the vibrations constituted a nuisance which deprived her "of the peaceful enjoyment of her home."

In her deposition and answers to WMATA's interrogatories, Beatty stated that the damage began in 1978, and became very severe in 1983 when she noticed that "a hole developed on one ceiling and ... cracks throughout the entire house." In her answer to interrogatories she stated that the "basement block foundation of the house developed cracks between January 12, 1985 and the present." Her deposition noted that the vibrations vary, stating that, "during the rush hour it is worse and then non-rush hour they don't go as fast and they don't run quite as often." In her deposition she also stated that, in addition to structural damage to her house, china has fallen from her china closet: "when you open the door my dishes have fallen to the floor and broken."

Pursuant to Fed.R.Civ.P. 56(b), WMATA moved for summary judgment. On November 18, 1986, holding that Beatty's claims were barred by the District of Columbia's three-year statute of limitations for actions for injury to real or personal property, D.C. Code Ann. § 12–301(3) (1981), the district court granted WMATA's motion. *Beatty v. Washington Metro. Area Transit Auth.*, Civ. Action No. 86–0478, slip op. at 2 (D.D.C. Nov. 18, 1986). Since the district court concluded that the trespass and nuisance were "of a permanent nature," it held that the statute of limitations began to run when Beatty "knew of the injury that would befall her." *Id.* at 7.

Pursuant to Fed.R.Civ.P. 59(e) and 60(b), Beatty subsequently moved for reconsideration of the grant of summary judgment. *Beatty v. Washington Metro. Area Transit Auth.*, Civ. Action No. 86–478 (D.D.C. Feb. 17, 1987). Beatty maintained that the nuisance was not permanent, but temporary or continuing, since it was abatable. *Id.* at 3. Hence, she contended that the cause of action was not barred by the statute of limitations. *Id.* In support of her motion, Beatty referred to a report prepared by Dr. George Wilson of Wilson, Ihrig & Associates, Inc., WMATA's acoustical consultant, which stated that the vibrations could be reduced by various methods. *Id.* at 1–2. The district court held that Beatty did not justify her failure to present Dr. Wilson's report to the court prior to the decision granting summary judgment. *Id.* at 2. Hence, stating that "summary judgment was properly granted in favor of defendant," the district court denied Beatty's motion for reconsideration. *Id.* at 4.

## II. THE GRANT OF SUMMARY JUDGMENT

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ. P. 56(c). Since summary judgment is a

determination of law rather than fact, we need not defer to the district court's conclusions and reverse only if clearly erroneous, but rather, may review the matter de novo. *See Caiola v. Carroll*, 851 F.2d 395, 398 (D.C.Cir.1988) (citing *Nepera Chem., Inc. v. Sea–Land Serv., Inc.*, 794 F.2d 688, 699 (D.C.Cir.1986).

Beatty contends that the district court erred in granting summary judgment on the basis that its claim was time barred, since WMATA "failed to produce any affidavits or other evidence to support its [WMATA's] argument" that the nuisance was permanent and not abatable. WMATA, however, contends that the district court properly ruled that Beatty's action was time barred, because the nuisance was permanent as a matter of law, and Beatty failed to establish an essential element of her case, namely, that the nuisance was continuing.

The Supreme Court in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), discussed the respective burdens of the parties when a motion is made for summary judgment. In *Celotex*, the United States District Court for the District of Columbia granted the defendant Celotex's motion for summary judgment against plaintiff Catrett on the ground that Catrett did not support her complaint of wrongful death with evidence that the decedent had been exposed to Celotex's asbestos products. This court reversed, holding that Celotex's failure to support its motion with any evidence which tended to negate Catrett's claim, precluded the entry of summary judgment in its favor. *Catrett v. Johns–Manville Sales Corp.*, 756 F.2d 181, 186 (D.C.Cir.1985). The Supreme Court granted certiorari, and reversed, holding that "Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552. The Supreme Court further stated that, "unlike the Court of Appeals, we find no express or implied requirement in Rule 56 that the moving party [Celotex] support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323, 106 S.Ct. at 2553 (emphasis in original).

The Supreme Court explained that "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion," and that there is an "absence of a genuine issue of material fact." *Id.* A motion properly made and supported by the moving party requires that the non-moving party "set forth specific facts showing that there is a genuine issue for trial," by responding with affidavits, depositions, answers to interrogatories and admissions on file. *See* Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. Although a moving party may not be required to support its motion with affidavits, it is still clear that summary judgment should only be granted in cases when "whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2553.

A close reading of *Celotex* will reveal that the Court agreed as to the principles embodied in Rule 56 for the granting of summary judgment. Indeed, Justice Brennan, in his dissent, expressly stated that he did not disagree with the majority's legal analysis. *See id.* at 329, 106 S.Ct. at 2556 (Brennan, J., dissenting). The question presented was whether the defendant, Celotex, the moving party, had satisfied its initial burden of production in moving for summary judgment on the ground that the plaintiff, Catrett, the nonmoving party, lacked evidence to establish an essential element of her case. It was on the application of the fundamental principles to the particular facts of that case that the court divided.

Justice White, who cast the fifth vote to create the majority in *Celotex*, favored the remand because he believed that the Court of Appeals should reevaluate whether the defendant-movant, Celotex, had met its initial burden of production. It is significant, therefore, that, in his brief concurring opin-

ion, Justice White stated: "the movant must discharge the burden the Rules place upon him: It is not enough to move for summary judgment without supporting the motion in any way or with a conclusory assertion that the plaintiff has no evidence to prove his case." *Id.* at 328, 106 S.Ct. at 2555 (White, J., concurring). Hence, the crucial question is always whether the pleadings and other submissions "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

■ In this case, therefore, the question to be determined, is whether WMATA properly and sufficiently supported its motion for summary judgment in showing that there was "no genuine issue as to any material fact," and that it was "entitled to a judgment as a matter of law." Beatty stated in her complaint, and the record indicated, that the vibrations were continuing and that the damage and nuisance would continue. Furthermore, in her deposition and answers to WMATA's interrogatories, Beatty specifically stated that the vibrations, which damaged her house, were of a continuing and varying nature. In light of her complaint and the record, it was necessary for WMATA to show that the nuisance was not abatable, thereby establishing that it was permanent, and, therefore, that the action was barred. WMATA, however, submitted no evidence which supported its motion, and which showed that the nuisance was permanent. Hence, on the record before the court WMATA's submissions did not foreclose the possibility of the existence of facts from which a jury could reasonably infer that the nuisance was continuing in nature. It is important to note that " '[o]n summary judgment the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)).

Beatty contends that the district court also erred in denying her motion for reconsideration, and in holding that, since she did not submit, at the summary judgment stage, evidence showing that the nuisance was a continuing one, summary judgment was proper. Beatty states that the district court's grant of summary judgment "on the sole issue of the statute of limitations, ... came as quite a surprise" to her, since WMATA's motion for summary judgment relied essentially on its defense of immunity and contained only one paragraph on the statute of limitations issue. Beatty adds that she did not believe that there was any need to provide "an evidentiary rebuttal" to WMATA's contention, since WMATA's motion for summary judgment made "no mention or argument whatsoever to dispute [her] complaint that the nuisance in this case was a 'continuing nuisance' which would defeat the statute of limitations argument." Hence, Beatty contends that WMATA did not submit a properly supported motion for summary judgment which showed that no genuine issue of material fact existed.

It is evident from the entire record in this case that the entry of summary judgment against Beatty was not appropriate, since WMATA did not satisfy the standard for the grant of summary judgment. Fed. R.Civ.P. 56(e) provides that a party must justify its opposition to a motion for summary judgment with specific facts if the motion is "supported as provided in this rule." It is clear that, even if the nonmoving party fails to submit opposing evidence, summary judgment shall be entered only "if appropriate." *See* Advisory Committee Note to 1963 Amendment of Fed.R.Civ.P. 56, *reprinted in* 31 F.R.D. 648, 648 ("Where the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented.").

Dr. Wilson's report, which supported Beatty's contention that the vibrations were of a continuing nature, was known to both parties, since Beatty had obtained the report from WMATA. In stating that the vibrations could be reduced, the report con-

firmed what already appeared from the record, i.e., that there existed a genuine issue as to the nature of the invasion. Consequently, WMATA could not properly have asserted that there were no genuine issues for trial. *See Sartor v. Arkansas Natural Gas Corp.*, 134 F.2d 433, 436 (5th Cir.1943) (on motion for summary judgment "it is the duty of counsel for plaintiff and defendant to fully disclose what the evidence will be on the issues raised by the motion. . . ."), *rev'd on other grounds*, 321 U.S. 620, 64 S.Ct. 724, 88 L.Ed. 967 (1944).

The Supreme Court has stated that there is no genuine issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. . . ." *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356. In this case, the record reveals that WMATA has failed to satisfy its initial burden of production showing that no genuine issue exists and that it is entitled to judgment as a matter of law. *See* 10A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2727 (2d ed. 1983). *See also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Indeed, the record shows that there exist issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

### III. Beatty's Claim of Nuisance

■ Nuisance, an ancient and fertile tort, is defined by the Restatement as "an interference with the interest in the private use and enjoyment of the land. . . ." Restatement (Second) of Torts § 821D comment d (1977). In nuisance actions it is important, for statute of limitations purposes, to ascertain whether the invasion or interference is "permanent" or "continuing." *See generally* D. Dobbs, *Remedies* § 5.4 (1973).

■ In general terms a permanent nuisance may be defined as one of such a character, and existing under such circumstances, that it will be reasonably certain to continue indefinitely in the future. *See Harrisonville v. W.S. Dickey Clay Mfg. Co.*, 289 U.S. 334, 339 n. 4, 53 S.Ct. 602, 604 n. 4, 77 L.Ed. 1208 (1933); *Stockdale v. Agrico Chem. Co.*, 340 F.Supp. 244, 253 (N.D. Iowa 1972). If the invasion is deemed to be "permanent," there is but one cause of action, and the statute of limitations commences to run from the time the invasion began, or when it became known to the aggrieved party. *See* D. Dobbs, *Remedies* § 5.4, at 343.

■ A temporary or continuing nuisance is one which is "abatable," or, also, one which is intermittent or periodical. *See Harrisonville*, 289 U.S. at 337, 341, 53 S.Ct. at 603, 605 (1933); *Signal Mountain Portland Cement Co. v. Brown*, 141 F.2d 471, 476 (6th Cir.1944); *Black's Law Dictionary* 962 (5th ed. 1979). For statute of limitations purposes, the distinction between a permanent or continuing nuisance is crucial because, if the invasion is deemed "temporary" or "continuing," a new cause of action arises with each new invasion or injury. *See* D. Dobbs, *Remedies* § 5.4, at 343; *see also Rapf v. Suffolk County*, 755 F.2d 282, 291 (2d Cir.1985). Here, since the district court concluded, as a matter of law, that the nuisance was permanent, it held that the action was barred by the statute of limitations, and granted summary judgment in favor of WMATA. *See Beatty*, slip op. at 2 (Nov. 18, 1986).

In granting summary judgment for WMATA, the district court stated that "[w]hether trespass is 'permanent' or 'continuing' is determined primarily by looking at the physical permanence of the source of the property invasion and the value of the source of the invasion to the community and the likelihood that the invasion could be enjoined." *Id.* at 3 (Nov. 18, 1986). In construing the terms "permanent" and "continuing," the district court cited *L'Enfant Plaza East, Inc. v. John McShain, Inc.*, 359 A.2d 5 (D.C.1976). In *L'Enfant*, the District of Columbia Court of Appeals considered whether the encroachment of a building's footing into adjoining property was a permanent or continuing trespass. In determining permanency the court

adopted three factors set forth in Professor Dobbs' text on Remedies:

(1) is the source of the invasion physically permanent, i.e., is it likely, in the nature of things, to remain indefinitely? (2) is the source of the invasion the kind of thing an equity court would refuse to abate by injunction because of its value to the community or because of relations between the parties? (3) which party seeks the permanent or prospective measure of damages?

D. Dobbs, *Remedies* § 5.4, at 338. The court concluded that since the footing of the building could be removed "without undue difficulty ... it was not likely to remain indefinitely," and, thus, was a continuing trespass. *L'Enfant,* 359 A.2d at 6.

The district court, in this case, stated that "[u]nlike the temporary structuring in *L'Enfant* ... the Metrorail system is likely to remain in place indefinitely." *Beatty,* slip op. at 3 (Nov. 18, 1986). WMATA states that the district court properly applied, to the present case, the factors of *L'Enfant* for permanency. According to WMATA, the permanency of the Metrorail system and its great value to the community are unquestioned, and, therefore, the first two factors of the *L'Enfant* test support a finding of permanence. Beatty, however, contends that WMATA's argument ignores the fact "that the instant case does not involve an 'encroachment' at all," but "recurrent vibrations emanating from outside [her] property...."

The district court concluded that the vibrations were of a permanent nature, stating, "[v]ibrations are an inevitable incident of any subway or train system," and "they are going to continue so long as metrorail trains operate." *Id.* at 3, 7. While vibrations may be inevitable, vibrations of such intensity that they cause damage to a house 65 to 80 feet from the train tracks might not be held to be an inevitable incident of the Metrorail system.

Support for Beatty's contention that the vibrations are continuing, even though the Metrorail is a permanent structure, may be found in Professor Dobbs' analysis of the relevant factors to determine permanency.

Professor Dobbs notes that "[i]f the nuisance arises out of the particular way in which [an] operation is carried out, and present technology demonstrates that the operation can be changed at reasonable expense to avoid the nuisance, then the nuisance is not physically permanent at all because we would predict a substantial change as likely." D. Dobbs, *Remedies* § 5.4, at 338.

The explanation is pertinent since Beatty maintains that the vibrations are not permanent because they can be abated or reduced. Furthermore, Beatty stresses that "abatement of the nuisance in this case does not require anything extraordinary or drastic such as terminating Metrorail service on the Redline." It was in support of this contention that Beatty submitted, on her motion for reconsideration, the report of Dr. George Wilson which described several methods by which the vibrations could be abated or reduced. In denying Beatty's motion for reconsideration, the district court stated that the "plaintiff seriously misconstrues the meaning of 'abatable,'" in maintaining that if "the nuisance and trespass are subject to correction," they are "not properly denominated 'permanent.'" *Beatty,* slip op. at 3 (Feb. 17, 1987). In the view of the district court, "[a]n abatable nuisance or trespass is *not* one subject to any amelioration, ... the inquiry on this point is restricted to whether the trespass or nuisance is 'abatable by a proceeding in equity.'" *Id.* (emphasis in original) (citing Restatement (Second) of Torts §§ 161, 899 comment d (1977)). Consequently, it concluded that it "cannot but find that equity would not restrain so important an activity as public transit operation." *Beatty,* slip op. at 4 (Feb. 17, 1987).

Since the benefits that public transit offers to the community are not in issue, the question is not whether equity will "restrain so important an activity." The question, rather, is whether the nuisance resulting from its operation is permanent, as a matter of law, for statute of limitations purposes. Having concluded that the nuisance was not "abatable" by a proceeding in equity, the district court held that the

nuisance was permanent, and, therefore, the action was barred by the statute of limitations. On the question of abatability, it must be noted that Dr. Wilson's report sets forth proposals that would reduce the vibrations without terminating transit service. The proposals, which would appear obvious, are: (1) "slow the speed of the trains as they pass station 184 + 00"; (2) "vibration isolate the house"; (3) "provide an underground isolation barrier parallel to the retaining wall."

■ Whether it was possible to abate the nuisance was a crucial question of fact. To assume that a nuisance is abatable only if it can be completely terminated or removed does violence to the law of nuisance. Although the word is derived from the French "abattre," which means to beat down or pull down, it also means to lessen, diminish, decrease or moderate. Indeed, it has been stated that an abatable nuisance is "one which is practically susceptible of being suppressed ... [it] does not necessarily mean that, in order to abate a nuisance, the structure or thing which has caused the injurious results should be destroyed." *Sanders v. Miller,* 52 Tex.Civ.App. 372, 379, 113 S.W. 996, 1000 (1908).

The view that the exercise of equitable jurisdiction would require the termination of a valuable public service misconceives the beneficial role of equity and the flexible remedies that it has fashioned. Indeed, the enduring contribution of equity is its ability to accommodate the competing or conflicting interests of all parties and the flexibility of its remedies. *See Hecht Co. v. Bowles,* 321 U.S. 321, 329, 64 S.Ct. 587, 592, 88 L.Ed. 754 (1944). ("The essence of equity ... has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it.").

In cases of nuisance, for centuries, courts of equity have resolved the conflicting interests of property owners, and have struck a balance to allow the reasonable enjoyment of their property. These actions were used as an early method of town planning, and helped regulate the advent of new industries and occupations. *See* E. Re, *Remedies* 431 (2d ed. 1987). They illustrate the value of the flexible remedies fashioned in nuisance cases, and the ability of equity to resolve disputes between adjacent property owners in an accommodating, and practical manner. For example, in *Sturges v. Bridgman,* L.R. 11 Ch.D. 852 (1878), the utility of a physician's consulting room was seriously affected by the vibration caused by the neighboring confectioner's business that used large pestles and mortars to pound "loaf-sugar." Although both parties were entitled to the reasonable use and enjoyment of their property, the court held that the plaintiff was entitled to an injunction. It is important to note, however, that that court decreed: "I will give [the defendant] a reasonable time ... to alter the position of his mortars." *Id.* at 859.

In *Hennessey v. Carmony,* 50 N.J.Eq. 616, 25 A. 374 (N.J. Ch. 1892), a New Jersey Court of Equity considered a case, not unlike in consequences to the case presently before us. The plaintiff sought to enjoin the use of drying machines which "whiz and revolve rapidly" causing noise and vibrations to plaintiff's property. Faced with the task of adjusting, or balancing the conflicting interests of the parties, the court granted the decree, but provided "that the defendant be restrained from so using his machines as to cause [plaintiff's] house to vibrate...." *Id.* at 631, 25 A. at 381.

Many examples can be found of the beneficial role of the courts, exercising the traditional powers of courts of equity, in resolving disputes which assure parties the reasonable enjoyment of their property. *See generally* Z. Chafee & E. Re, *Equity* 1212–1222 (4th ed. 1958). That this equitable role is as important today as in the days when new businesses seemed to threaten a prior way of life can be seen from important recent cases. *See, e.g., State ex rel. Cunningham v. Feezell,* 218 Tenn. 17, 400 S.W.2d 716 (1966) (crematory in rural residential area).

All of the cases demonstrate that abatement does not necessarily mean total cessa-

tion or termination of the challenged activity. Rather, it implies a wise exercise of discretion which considers and balances all of the pertinent factors, including, of course, the equities of the parties and the rights of the public. The Massachusetts case of *Boston Ferrule Co. v. Hills*, 159 Mass. 147, 34 N.E. 85 (1893), gives expression to the function of the court in delineating the respective rights of the parties. Justice Holmes, then a member of the Supreme Judicial Court of Massachusetts, in considering a bill in equity to enjoin the defendant from allowing sand and acids from coming on the plaintiff's premises, wrote: "As any line of adjustment between conflicting rights must be drawn on practical grounds, there is no doubt that it may vary under different circumstances." *Id.* at 150, 34 N.E. at 86–87. In devising an appropriate remedy, the words of Justice Frankfurter, in *Eccles v. Peoples Bank*, 333 U.S. 426, 68 S.Ct. 641, 92 L.Ed. 784 (1948), are also pertinent:

> It is always the duty of a court of equity to strike a proper balance between the needs of the plaintiff and the consequences of giving the desired relief. Especially where governmental action is involved, courts should not intervene unless the need for equitable relief is clear, not remote or speculative.

*Id.* at 431, 68 S.Ct. at 644.

■ Since equity will not grant an inequitable decree, the judgment of the court will reflect an equitable adjustment of the conflicting interests presented. *See McCann v. Chasm Power Co.*, 211 N.Y. 301, 305, 105 N.E. 416, 417 (1914) (If the protection of a legal right would do a plaintiff little good and produce great public or private hardship, "equity will withhold its discreet and beneficent hand.").

■ An important distinction not mentioned by the district court is that nuisances may be classified for two distinct purposes, one for the assessment of damages, and the other for the application of the statute of limitations. *See* D. Dobbs, *Remedies* § 5.4, at 343. The court, in determining the statute of limitations may be influenced by different considerations than in determining proper damages. *See id.* Hence, a nuisance may be classified as "permanent" for the purpose of assessing damages, and as "continuing" for statute of limitations purposes. *See id.* at 343–44. The Supreme Court applied this dual standard in *Harrisonville v. W.S. Dickey Clay Mfg. Co.*, 289 U.S. 334, 53 S.Ct. 602, 77 L.Ed. 1208 (1933), when it awarded a permanent measure of damages, yet found the nuisance was not permanent for the purpose of the statute of limitations.

In *Harrisonville*, owners of a farm, near a sewage disposal plant operated by the city, complained that a drain pipe that discharged pollutants into a stream on the property, was a nuisance, and sought damages as well as injunctive relief. The Court held that the nuisance was "continuous or recurrent" in nature. *Id.* at 337, 53 S.Ct. at 603. The Court, however, denied the plaintiffs injunctive relief noting that "[w]here an important public interest would be prejudiced, the reasons for denying the injunction may be compelling." *Id.* at 338, 53 S.Ct. at 603. The Court, however, emphatically rejected the City's argument that plaintiffs' action was time barred because the nuisance was permanent in nature. The court found "no occasion to determine the scope of the doctrine of permanent nuisance as applied" in the local law since the nuisance could at all times be removed, and thus "[b]eing so terminable, pollution of the creek cannot be deemed to be a permanent nuisance as of the date of the installation of the disposal plant...." *Id.* at 341, 53 S.Ct. at 605.

The case law reveals that there is no single, all-inclusive rule to determine whether a nuisance is continuing or permanent, and that each case must be decided on its specific facts. It is well settled, however, that whether viewed as a case seeking equitable relief or purely monetary damages, questions of fact must be determined by the trier of facts. *See, e.g., Signal Mountain Portland Cement Co. v. Brown*, 141 F.2d 471, 474 (6th Cir.1944) (In action for damages for nuisance, whether nuisance was permanent or temporary was a question of fact for the jury); *Hartzler v.*

*Town of Kalona,* 218 N.W.2d 608, 610 (Iowa 1974) (In action for damages for nuisance, whether nuisance was permanent or temporary should be determined by the trier of fact). Consequently, the grant of summary judgment by the district court was inappropriate.

## IV. WMATA's CLAIM OF IMMUNITY

As an alternative ground for the affirmance of the summary judgment in its favor, WMATA asserts its governmental immunity under section 80 of the WMATA Compact. The district court granted defendant's motion solely on the basis of the statute of limitations, and did not consider WMATA's immunity defense. Nonetheless, WMATA is entitled to sustain the district court's grant of summary judgment on the ground of its claim of governmental immunity. In the words of the Supreme Court "[t]he prevailing party may, of course, assert in a reviewing court any ground in support of his judgment, whether or not that ground was relied upon or even considered by the trial court." *Dandrige v. Williams,* 397 U.S. 471, 475 n. 6, 90 S.Ct. 1153, 1156 n. 6, 25 L.Ed.2d 491 (1970).

It is not questioned that "[a]s a quasi-governmental entity created by its signatory parties, WMATA is entitled to share the sovereign immunity of those parties with respect to common law tort actions." *Heffez, v. WMATA,* 569 F.Supp. 1551, 1552 (D.D.C.1983), *aff'd without op.,* 786 F.2d 431 (D.C.Cir.1986). Section 80 of the Compact, however, allows only a limited waiver of immunity. Specifically, section 80 provides that:

> The Authority shall be liable for its contracts and for its torts ... committed in the conduct of any proprietary function ... but shall not be liable for any torts occurring in the performance of a governmental function....

D.C.Code Ann. § 1–2431 (1981).

WMATA contends that its activities giving rise to the nuisance are governmental functions. More specifically, WMATA claims that the selection of the routes for the Metrorail system was a governmental function for two reasons: (1) the system was built pursuant to a statutory mandate; and (2) the design of public facilities is a discretionary, or legislative function of government. According to WMATA, the plaintiff's claim is an attack on the design of the Metrorail system, and the placement of the line near her home. Thus, WMATA concludes that, since the Metrorail design is a governmental function, it is immune from suit.

Beatty, on the other hand, emphasizes that she has made no claim based upon any negligent design. Rather, she contends that her claim rests entirely on the nuisance caused by the "operation" of the Red Line each time the train passes 65 feet from her house. Hence, Beatty stresses that her complaint does not allege negligent design, but is predicated upon the operation of trains on that line and that, since operation is a proprietary function, WMATA is not immunized and is liable in tort.

The question presented is whether WMATA's activity which caused the nuisance arose out of the performance of a governmental or proprietary function within section 80 of the WMATA Compact. Since there are material questions of fact as to whether the nuisance was caused in the performance of a governmental or proprietary function, we cannot hold, as a matter of law, that WMATA is immune from suit under the WMATA Compact.

WMATA's tort liability depends upon whether the activity in question is a proprietary or governmental function. It has been said that the distinction between proprietary and governmental functions has created a "quagmire that has long plagued the law of municipal corporations." *Indian Towing Co. v. United States,* 350 U.S. 61, 65, 76 S.Ct. 122, 124, 100 L.Ed. 48 (1955). "A comparative study of the cases in the 48 States ... disclose[s] an irreconcilable conflict." *Id.* Indeed, the distinction has become so blurred that the Supreme Court has remarked that "[i]n actuality, the distinction between a municipality's governmental and proprietary functions is better characterized not as a line,

but as a succession of points." *Owen v. City of Independence*, 445 U.S. 622, 644 n. 26, 100 S.Ct. 1398, 1412 n. 26, 63 L.Ed.2d 673 (1980). In the words of an authority on municipal corporation law, "[t]he difficulty lies not in the statement of the governing principles of law, but in their application to particular facts." 18 E. McQuillan, *Municipal Corporations* § 53.29 (3d ed. 1984).

In *Dant v. District of Columbia*, 829 F.2d 69 (D.C.Cir.1987), we had occasion to say that:

> [W]e decline[ ] to interpret section 80 as requiring the court to distinguish between public and private sector functions in every case, a task so difficult, given the state of our society, that it would sometimes invite arbitrary judicial decision. Rather, ... we interpret[ ] § 80 as incorporating the distinction between discretionary and ministerial functions....

*Id.* at 74.

"Generally speaking, a duty is discretionary if it involves judgment, planning, or policy decisions. It is not discretionary [i.e., ministerial] if it involves enforcement or administration of a mandatory duty at the *operational level*, even if professional expert evaluation is required." *Jackson v. Kelly*, 557 F.2d 735, 737–38 (10th Cir.1977) (emphasis added).

Several cases decided by this court have held that WMATA's discretionary decisions are immune under section 80 of the Compact as governmental. *See, e.g., Dant*, 829 F.2d at 75 (design of WMATA's fare collection system is a governmental function); *Sanders v. WMATA*, 819 F.2d 1151, 1155–56 (D.C.Cir.1987) (drug testing of bus drivers involved in traffic accidents is a governmental function); *Morris v. WMATA*, 781 F.2d 218, 220 (D.C.Cir.1986) (promulgation and enforcement of police regulations are in exercise of a governmental function).

The cases teach that WMATA will not be liable for determinations made in establishing "plans, specifications or schedules of operations" for the Metrorail. *See Dalehite v. United States*, 346 U.S. 15, 35–36,

73 S.Ct. 956, 967–968, 97 L.Ed. 1427 (1953). WMATA, however, can be liable for a broad range of conduct which implements its discretionary decisions. *See Dant*, 829 F.2d at 75 (problems that arise due to the faulty maintenance and operation of the fare collection machines are ministerial operations, and thus, immunity is waived by section 80 of the Compact); *see also Owen*, 445 U.S. at 649, 100 S.Ct. at 1414 ("[w]hile the city retained its immunity for decisions as to whether the public interest required acting in one manner or another, once any particular decision was made, the city was fully liable for any injuries incurred in the execution of its judgment.").

In this case there is no dispute that the passing of the trains caused the vibrations that allegedly damaged plaintiff's house. There is, however, a dispute as to the underlying cause of the vibrations. WMATA asserts that Beatty is objecting only to the design of the Red Line, i.e., its placement in the street, the positioning of the retaining wall, etc. Although it is not entirely clear from Beatty's submissions, it appears that she is at least in part protesting the *implementation* of that design, and whether WMATA employees have followed or complied with it. We note that Beatty, in correspondence to the Metro Consumer Assistant on February 2, 1978, claimed that "[i]ron beams were put on the west side of the tracks, but I think they must have forgotten to put them on the east side of the tracks." WMATA's submissions have not sought to refute the claim. Thus, a trier of fact, so far as appears, could find that Beatty's alleged injuries were caused by WMATA's exercise of a ministerial function. Accordingly, on the papers considered on the summary judgment motion, it cannot be said that there were no genuine issues of material fact.

## V. CONCLUSION

In view of WMATA's failure to show that no genuine issues of material fact exist as to the nature of the nuisance and as to its alternative claim of sovereign im-

munity, and upon Beatty's showing that triable issues of material fact exist as to both grounds, we hold that the district court erred in granting summary judgment in favor of WMATA. Accordingly, the district court's grant of summary judgment is reversed, and the case is remanded.