Donald W. KREUZER,
D.M.D., Appellant,

v.

GEORGE WASHINGTON
UNIVERSITY,
Appellee.

Nos. 04–CV–1157, 04–CV–
1383 and 05–CV–42.

District of Columbia Court of Appeals.

Argued Feb. 10, 2006.
Decided April 13, 2006.

J. Michael Hannon, with whom James F. Bromley, Washington, DC, was on the brief, for appellant.

Vincent Mark J. Policy, with whom M. Ryan Jenness and Paul Martin Wolff, Washington, DC, were on the brief, for appellee.

Before FARRELL and REID, Associate Judges, and WYNN, Senior Judge, Superior Court of the District of Columbia.*

FARRELL, Associate Judge:

Dr. Kreuzer, a resident of Foggy Bottom in the District of Columbia, brought suit against George Washington University (GWU or the University) alleging primarily that GWU had (1) trespassed on his property by building a ten-story residence hall that cantilevered—or extended—over a party wall that has supported Dr. Kreuzer's house since it was built in the 1800's; and (2) engaged in unlawful "blockbusting" under the D.C. Human Rights Act[1] in an attempt to force Dr. Kreuzer to sell his property to the University at a below-market rate. He alleged other torts as well, including fraudulent inducement, intentional interference with prospective

---

* Specially designated pursuant to D.C.Code § 11–707(a) (2001).

1. D.C.Code §§ 2–1401.01 et seq. (2001) (hereafter "the Act").

economic advantage, nuisance, and defamation. GWU opposed the trespass claim on the ground that, because the party wall is located entirely on its property, the only right Dr. Kreuzer has with respect to the wall is the right of support, in the nature of a prescriptive easement. GWU further argued that it had not engaged in blockbusting and that, in any event, the statute of limitations barred that claim.

On the trespass claim, the trial judge granted summary judgment to the University after concluding, as a matter of law, that because the residence hall did not cross the property line, GWU was free to "increase the height of the wall without providing an ability for the adjoining property to tie into the addition, so long as the new wall [did] not interfere with the rights of support in the original wall." As to the blockbusting charge, the judge ruled that Dr. Kreuzer had not proffered evidence of such conduct occurring (if at all) within the statute of limitations provided by the Act. He likewise found no triable issues of fact on Dr. Kreuzer's remaining claims. We affirm.

## I.  Background

Since 1974 Dr. Kreuzer has resided in a townhouse located at 600 23rd Street, N.W. (Lot 9), in Square 43 of the District of Columbia land records. He also owns the adjoining townhouses at 602 and 604 23rd Street (Lots 8 and 7, respectively), which he rents to students. This case focused primarily on Lot 7. The only other property in Square 43, besides Dr. Kreuzer's lots and a large property known as the Remington Condominium, is current Lot 26 owned by GWU; it includes the property formerly known as Lot 6 that abuts Dr. Kreuzer's Lot 7 on the north side.

Until February 2000, a townhouse owned by GWU was situated on Lot 6. The homes on Lots 6, 7, 8, and 9 had been built simultaneously in 1879 by the same builder. The southern wall of the townhouse on Lot 6 was a wall ("a party wall") shared with the townhouse on Lot 7, providing support for both townhouses; the wall is approximately 10 inches wide. In 1891, the party wall had been extended westward to provide support for an addition to Dr. Kreuzer's townhouse, but not to any structure on Lot 6. The trial judge found this extension to be a "seamless addition" to the original wall, and thus viewed the whole structure as a single party wall. Relying on a field report in turn based on a land survey by the Bernard Locraft Company, the judge further found that the north wall of Dr. Kreuzer's Lot 7 townhouse, consisting of the party wall and the addition to it, lies north of the property line separating Lots 7 and 6, and therefore is located entirely on GWU's property.

In February 2000, the University demolished the townhouse on Lot 6 to make way for a new student residence hall. After approval by the Board of Zoning Appeals, construction of the dormitory began in 2002 and finished in 2004. Based upon an inspection by surveyor Edward Lopez in February 2004, the trial judge concluded, as a matter of law, that the residence hall as constructed does not extend beyond GWU's property line. At the time of demolition, the party wall was left in place and continues to support Dr. Kreuzer's townhouse.

The primary source of contention here (or at least a key one among Dr. Kreuzer's multiple grievances) is that, although the first three floors on the south wall of the dormitory are built straight up on GWU's Lot 6 about an inch from the north side of the party wall, when the south wall reaches the height of the party wall, the concrete floor slab cantilevers to the south over the top of the shared wall up to GWU's property line and ascends upward

from there. (The residence hall does not rest on or touch the party wall; separating them is a two inch gap between the concrete floor slab and the top of the party wall.)

Before and during the course of the construction of the residence hall, GWU and its representatives had many discussions with Dr. Kreuzer about the process. Some of these discussions included negotiations for the purchase of Dr. Kreuzer's townhomes, and others responded to Dr. Kreuzer's concerns about the construction. Undoubtedly, GWU engaged in some hardball negotiation tactics with Dr. Kreuzer, and these interactions form the basis for appellant's second major claim—blockbusting in violation of the DCHRA.

## II. Discussion

Following lengthy discovery, the trial judge granted judgment as a matter of law to GWU on all of Dr. Kreuzer's claims. Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Super. Ct. Civ. R. 56(c). We review the trial court's grant of summary judgment *de novo*, employing the same legal standards as the trial court. *See, e.g., Joeckel v. Disabled Am. Veterans*, 793 A.2d 1279, 1281 (D.C. 2002). We consider Dr. Kreuzer's claims, which are both substantive and procedural, in succession.

### A. Trespass

■ In granting summary judgment on this claim, the trial judge found no dispute over the fact that the "party wall ... lies entirely to the north of the record property line; in other words, it stands entirely on GW's property," so that "the dormitory does not cross the property line." Al-

though at times in his briefs Dr. Kreuzer appears to dispute this point, he is precluded from doing so. Repeatedly in the trial court he admitted that the party wall is located entirely on GWU's property. Attached to his motion for a temporary restraining order, for example, was an affidavit by Ken West, a professional land surveyor, stating that "the north building wall of [Dr. Kreuzer's townhouse] does in fact lie in its entirety over the north property line of [Dr. Kreuzer's Lot] and on [GW's Lot]." And Dr. Kreuzer's amended complaint itself states that "[t]he north wall of Dr. Kreuzer's townhome ... is a structural wall that is located entirely over the 100 year-old boundary line with GW's Lot ... on [GW's] lot's south side." Finally, Dr. Kreuzer formally admitted GWU's proffered undisputed fact that "[t]he [p]arty [w]all lies entirely to the north (that is, on [GWU's lot]) of the record property line between [Dr. Kreuzer's Lot] and [GW's Lot]." These representations are judicial admissions, *see, e.g., Bostic v. Henkels & McCoy, Inc.*, 748 A.2d 421, 423 n. 2 (D.C. 2000); *Royall v. Weitzman*, 125 A.2d 680, 682 (D.C.1956) ("A ... judicial admission is ... a substitute for evidence in that it does away with the need for evidence.... [F]acts judicially admitted are facts established" (citations and internal quotation marks omitted)), which Dr. Kreuzer may not now foreswear. Moreover, they comport with the conclusion of the field report based on the Locraft survey, to which Dr. Kreuzer offered no similar contrary evidence.

■ Legal analysis of Dr. Kreuzer's claim thus begins—and, as we will see, essentially ends—with the fact that the party wall is situated wholly on GWU's property. The respective rights of adjoining property owners concerning a wall that has this unusual feature—lying entirely on

one owner's property[2]—have not been spelled out by a court decision in this jurisdiction. Nevertheless, in *Fowler v. Koehler*, 43 App.D.C. 349 (1915), the Circuit Court long ago recognized that "[t]he erection of a party wall by one of the two adjoining owners ... amounts only to the establishment of a mutual easement or servitude and benefit" and "does not change the boundaries nor affect the title of the respective properties." *Id.* at 357. This accords with the common law's general understanding that "[r]ights of way [and] rights to use party walls ... are acquired by prescription" rather than "adverse possession," the key difference being that while "[s]uccessful adverse possession results in acquisition of a possessory estate," "the owner of a servitude is only entitled to make the particular use authorized by the servitude." RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) § 2.17 cmt. a, at 261 (2000). The distinction between ownership and an easement of servitude was made clear in an early decision of the Court of Appeals of Maryland that has special relevance here, both because of the deference this court generally accords such decisions,[3] and because of its roughly similar facts.

In *Barry v. Edlavitch*, 84 Md. 95, 35 A. 170 (1896), the parties owned adjoining houses connected by a party wall that furnished support for both. The shared wall had a front portion and a rear portion, the rear portion being entirely within Barry's property lines. *Id.* at 170–71. Edlavitch brought suit for damages after Barry, taking the necessary precautions, tore down the rear portion of the wall and built a new, thicker wall to support a larger build-

ing. In rejecting the suit, the court of appeals held that Edlavitch's rights in the wall were limited to the support of his house, because "[t]here [was] nothing ... from which it [could] be presumed that either party intended that the wall should be a party wall ... *except to the extent and for the purpose of supporting* [Edlavitch's] building." *Id.* at 172 (emphasis added). Because the wall was "the property of [Barry] and on his own lot," the court said, "there can be no reason assigned why he could not strengthen it and add to its height if he chose to do so; provided it was done without detriment to the other party's right." *Id.* Edlavitch, by contrast, "has no rights in or to that part of the new wall which is above the height of the old, and which is not required for the support of the timbers of his house." *Id.* By the same token, he had no right to build up the wall on "his half" of the party wall.

■ Essentially in the shoes of Edlavitch, Dr. Kreuzer may not claim trespass when the cantilevered portion of GWU's dormitory extends up to the line of the University's property but no farther and poses no danger to his easement of support. Like the defendant Barry, GWU was free to construct above the party wall on its own property so long as it did so without detriment to Dr. Kreuzer's servitude. *See* RESTATEMENT, *supra*, cmt. g, at 272 ("The servient owner is entitled to make any use of the servient estate that will not unreasonably interfere with enjoyment of the servitude"); *302 Lexington Ave. Corp. v. 37th Street & Lexington Ave.*

---

**2.** "A party wall, as it is generally defined and understood, is a wall erected and standing on the line *between two estates* ... owned by different persons for the use in common of both estates." *Moore v. Shoemaker*, 10 App. D.C. 6, 14 (1897) (emphasis added).

**3.** *See, e.g., Walker v. Independence Fed. Sav. & Loan Ass'n*, 555 A.2d 1019, 1022 (D.C.1989) (explaining that "[i]n the absence of appellate or other authority in this jurisdiction, the Court may be guided by Maryland common law").

*Corp.*, 34 N.Y.S.2d 445 (Sup.Ct.1942) (upholding defendant's right to "carry up a party wall" twelve stories to create "an independent enclosing wall," because "[t]he defendant ... has neither encroached upon the plaintiff's property nor disturbed the integrity of the party wall"). Dr. Kreuzer attempts to distinguish the *Barry* case by arguing that his rights in the party wall do not stem from the land records and the law of easements, but rather "originate from an implied agreement formed from the conduct of the previous owners over 126 years and from the intention of the original builder" (Br. for App. at 26). This "agreement" appears to have been that the party wall straddled the property line rather than lying on one side of it. *See, e.g.,* Rely Br. for App. at 6 ("Is it more probable to believe that the paint on the front of 604 and 606, which changes color exactly in the middle of the Party Wall, and the iron fence that separates their front yards exactly in the middle of the Party Wall, more accurately reflects the location of the Property Line than GW's field report derived from the Locraft Survey?"). But, as we have seen, this contradicts the repeated contrary admissions by Dr. Kreuzer in the trial court. Moreover, the conduct by successive owners that Dr. Kreuzer treats as evidence of a "change [in] the boundaries," *Fowler*, 43 App.D.C. at 357, is consistent with an agreement to do nothing more than abide by the conditions of an easement of mutual support. As we have seen, the existence of a party wall does not change the location of the property line or alter title to the land, nor does it give rise to a claim of adverse possession. *Fowler, supra; Barry, supra; Moore, supra* note 2, 10 App. D.C. at 14–15. Dr. Kreuzer's "agreement" among past owners to confer greater property rights on him than recognized by these authorities has no support in law or fact.

Dr. Kreuzer argues, finally, that whatever his rights with respect to the original party wall, the westerly addition built in 1891 became his property by adverse possession because no adjoining structure used it as a party wall (until, that is, GWU's encroachment). However, a true party wall—unlike, say, a free-standing garden wall—does not lose that character and confer a possessory estate because the adjoining owner has not made use of it. As the court stated in *Robinson v. Hillman,* 36 App.D.C. 576 (1911), "[t]he regulations [governing party walls] ... necessarily contemplate future growth, and probable changes in the uses of property"; so that a wall "may be upheld as a party wall, if it be reasonably and properly *susceptible of such use.*" *Id.* at 581–82 (emphasis added); *see also Cappelletti v. Auerbach,* 87 F.Supp. 355, 356 (D.D.C. 1949) ("the entire [party] wall is suitable for use by the plaintiffs, if and when they desire to break into and make use of it"). The trial judge found the extension here to be a seamless addition to the original wall. For us to regard it as something other than a party wall, with the attendant right of support this confers, would artificially expand Dr. Kreuzer's ownership rights. The trial judge correctly rejected the trespass claim as a matter of law.

## B. Blockbusting

D.C.Code § 2–1402.22, part of the Human Rights Act, makes it an unlawful discriminatory practice

> for any person ... directly or indirectly to engage in the practice[ ] of "blockbusting[,]" ... including ... the commission of any 1 or more of the following acts:
>
> (1) To ... attempt to promote, induce, or influence a transaction in real property through any representation,

means or device ... calculated to induce a person to discriminate or to engage in such transaction ... in response to discrimination, prejudice, fear or unrest adduced by such means.

Evidently relying on the fact that the Act elsewhere prohibits an array of "unlawful discriminatory practice[s]" based on categories including "matriculation," meaning (partially) "the condition of being enrolled in a college, or university," *id.* §§ 2–1401.02(18), –1402.11(a), Dr. Kreuzer sued the University for blockbusting, alleging in essence that GWU—through its president, Stephen Trachtenberg—had threatened that if he did not sell his property to it at a below-market rate, the influx of dormitory-housed students into his block would greatly reduce the property's value.

The Act also requires that private suits for discrimination "in real estate transactions" be brought "within 2 years of the unlawful discriminatory act." Section 2–1403.16(a). As Dr. Kreuzer's complaint was filed on May 5, 2003, the act on which he relied had to have occurred after May 5, 2001. The trial judge, after reviewing all of the acts alleged, concluded (a) that the principal acts among them had occurred before May 5, 2001, and (b) that the acts occurring later were not blockbusting and so could not rescue the earlier acts on a theory of "continuing violation." We agree with the trial judge.[4]

Dr. Kreuzer offered evidence of a series of statements by GWU officials in 1999 and 2000 which he alleged were designed to intimidate him, including a statement by President Trachtenberg to him personally in which (he recalled) the president said "we're going to build a dormitory right next to you and no person in his right mind would want to live next to a dormitory." (Further, according to Dr. Kreuzer, the president promised to put a fraternity across the street.) Dr. Kreuzer recognizes that these utterances themselves fell outside the statute of limitations. He contends, however, that he offered proof of a pattern of "continuing violations" extending well into the statutory period, relying on this court's decision in *Lively v. Flexible Packaging Ass'n,* 830 A.2d 874 (D.C. 2003), which also construed the D.C. Human Rights Act. But the availability of *Lively* and the continuing tort theory to support Dr. Kreuzer's claim is questionable. The statute of limitations issue in *Lively* was shaped by the unique nature of the violation alleged there, *i.e.,* creation of a sexually hostile work environment. In keeping with the recent Supreme Court decision of *National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), we concluded that by its very nature a forbidden hostile work environment is "one unlawful employment practice" continuing over time, *id.* at 890, and thus that a single act evincing this environment and occurring within the limi-

---

**4.** GWU first argues (though in a footnote, and to preserve the issue) that even as alleged this case is not about "blockbusting," given the historic understanding of that term as involving racial discrimination. At the same time, recognizing the Act's broad definition of the practice and its inclusion of "matriculation" as a forbidden basis for discrimination, the University further questions how it can be alleged even to have tried to intimidate Dr. Kreuzer based on "matriculation" given the fact, *inter alia,* that he rents two of his town-houses to GWU students. The fear of being surrounded by *too many* students, it says, cannot be a basis for claimed discrimination except on a grossly over-expansive reading of the Act. Like the trial judge, however, we are unwilling to say that using the threat of mass housing of students nearby to influence a real estate transaction could not fit the statute's broad definition of blockbusting; our resolution of the appeal makes it unnecessary; in any event, to decide that issue.

tations period is enough to make "'the entire time period of the hostile environment'" count "'for the purposes of determining liability.'" *Id.* (quoting *Morgan*, 536 U.S. at 117, 122 S.Ct. 2061). By contrast, blockbusting as the Act defines it is not continuous in nature; the violation Dr. Kreuzer alleges can consist of as little as a single act of "attempt[ing] to ... induce ... or influence" a real property transaction in the forbidden manner. Section 2–1402.22. And *Lively*, by "adopt[ing] the Supreme Court's analysis in *Morgan*," *id.* at 890, implies that such "'discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.'" *Id.* at 889 (quoting *Morgan*, 536 U.S. at 122, 122 S.Ct. 2061).

■ The availability of the continuing tort theory to support claims of violation of § 2–1402.22 is, in any case, a moot point because, as the trial judge recognized, Dr. Kreuzer offered no evidence of blockbusting within the limitations period. *See Boulton v. Institute of Int'l Educ.*, 808 A.2d 499, 503–04 (D.C.2002) ("A continuing violation exists where there is a series of related acts, *one or more of which* falls within the limitations period" (emphasis added; citations and quotation marks omitted)). In essence, Dr. Kreuzer merely asserted that after May of 2001 GWU began and continued the design and construction of the residence hall. So, for example, in his list of "Evidence of Blockbusting" presented to the court he cited to the facts that GWU had "entered into a Development Agreement with the Remington [Condominium]," and had then "proceeded with the construction without any permission from Dr. Kreuzer to trespass on, over or under this property." It is scarcely deniable—and fully confirmed by the record—that GWU had business reasons to proceed with the construction of the dormitory unrelated to any desire to intimidate Dr. Kreuzer into selling his property or to penalize him for not doing so. Dr. Kreuzer's contrary assertion that "a reasonable juror could conclude that there was *no purpose* in GW's design and construction other than to spite him" (Br. for App. at 17; emphasis added) cannot be taken seriously.[5] In late 2001 and early 2002, the Board of Zoning Adjustment had conditioned approval of GWU's Campus Plan for 2001–2010 on the school's "promptly tak[ing] decisive action to provide housing for the bulk of its undergraduate students on campus." *George Washington Univ. v. District of Columbia Bd. of Zoning Adjustment*, 831 A.2d 921, 929 (D.C.2003) (quoting Board). In keeping with that directive, GWU sought and received the Zoning Commission's approval in April 2002 to build the ten-story residence hall on the site adjoining Dr. Kreuzer's property.[6] Thus there is a wide gulf, to say the least, between the University's actual motives for its post-May 2001 actions and the scheme alleged by Dr. Kreuzer to drive him out of the neighborhood by the threat of an influx of students and reduced property value. President Trachtenberg had few communications with Dr. Kreuzer after that date (the last apparently being a letter in August 2001), and none can reasonably be viewed as a renewed warning of consequences if he did not sell—in short, an act of blockbusting

---

5. *See also* Br. for App. at 21 (the "construction of the [residence hall] and its use for student housing *were themselves part of* GW's long term plan to force Dr. Kreuzer to sell GW his property" (emphasis added)).

6. Dr. Kreuzer had been a party to these proceedings and did not appeal the Commission's approval of the dormitory.

under the statute.[7] The judge correctly dismissed the blockbusting claim as a matter of law.[8]

## C. Remaining Claims

Dr. Kreuzer's remaining contentions may be dealt with more summarily.

### 1. *Judgment as a matter of law.*

■ a. Dr. Kreuzer alleged that the University had fraudulently induced him to agree to allow a contractor to install a form of support called "tiebacks" during excavation for the dormitory. The trial judge rejected this claim, finding that "[p]laintiff ... has proffered nothing other than his conclusory pleadings to establish fraud, let alone demonstrated by clear and convincing evidence that he should be permitted to go forward." We agree. Dr. Kreuzer argues that his permission to use the tiebacks (which allegedly resulted in damage to his property) was fraudulently induced (a) by a letter telling him that the tiebacks were "necessary," and (b) promises from GWU to lease his townhouse as a construction office during the work. But the letter, viewed together with the deposition testimony explaining its genesis, fails to support a reasonable inference that the tiebacks were represented as, or that Dr. Kreuzer understood them to be, the sole ("necessary") means by which the support could be achieved—certainly not when

measured against the demanding clear and convincing evidence standard for claims of fraud. *See Bennett v. Kiggins,* 377 A.2d 57, 59 (D.C.1977). Likewise, Dr. Kreuzer offered no proof that the assurances that his townhouse would be used were made with knowledge of their falsity or with the intent not to fulfill them. Nor did he establish reliance, *id.,* since there was undisputed evidence that he was informed there would be no lease agreement at least by September 11, 2002, a full month before the October 25, 2002, agreement to allow the tiebacks.

■ b. Dr. Kreuzer alleged that the residence hall interfered with his prospective economic advantage because it denied him the economic benefit he anticipated from ownership of his townhouses. "To establish a prima facie case of interference with business relations, a plaintiff must show that the interference was intentional and that there was resulting damage." *Brown v. Carr,* 503 A.2d 1241, 1247 (D.C. 1986) (citation and internal quotation marks omitted). On this count the trial judge reasoned:

> At no point does [Dr. Kreuzer] allege that [GWU's] primary (or even ancillary) intent in building its dormitory was to interfere with [his] economic advantage, nor could he, given the absurdity on its

---

7. Dr. Kreuzer refers to an August 2001 memorandum from President Trachtenberg to his Vice President to employ "new faces" and new "strategies" in trying to get Dr. Kreuzer to sell his property. This, of course, was not a communication to Dr. Kreuzer himself; moreover, by asserting that the "new strategy consisted of massing the Dormitory over and around Dr. Kreuzer's townhomes and building the Dormitory with no regard to his rights" (Br. for App. at 31), Dr. Kreuzer repeats the mistake of equating the actual design and construction of the building—and GWU's reasons for constructing it—with a purpose to drive him from his property.

8. Because the trial judge considered, and found legally deficient, Dr. Kreuzer's list of "Evidence of Blockbusting" shown by discovery, his dismissal is more properly viewed as a grant of summary judgment. *See Kitt v. Pathmakers, Inc.,* 672 A.2d 76, 79 (D.C.1996). That characterization results in no unfairness to Dr. Kreuzer, who had been given abundant discovery and a full opportunity to counter GWU's arguments as to why, as matter of law, his claim was barred by the statute of limitations.

face of such a claim. While the dormitory may indeed harm [Dr. Kreuzer] and his ability to maximize the income from and value of his properties, there is no allegation that [GWU's] construction was *intended* to harm him.

This reasoning was correct. *See Brown, supra; Sheppard v. Dickstein, Shapiro, Morin & Oshinsky,* 59 F.Supp.2d 27, 34 (D.D.C.1999) (the "[p]laintiff cannot demonstrate liability without a strong showing of intent to disrupt ongoing business relations" (citation and internal quotation marks omitted)). Dr. Kreuzer's conclusory allegations do not meet the demanding test for liability under this cause of action.

**c.** Dr. Kreuzer made two claims of private nuisance regarding the residence hall. First, he alleged that the mere existence of the dormitory was a nuisance because GWU had misled the Zoning Commission in the process by which it approved the construction. But, as the trial judge recognized, Dr. Kreuzer never sought review of the Commission's decision by this court, nor sought to reopen the proceedings by presenting the Commission with evidence of fraud or material misinformation contributing to its approval. A civil suit for nuisance was not a legitimate proxy for those defaults. Second, Dr. Kreuzer alleged that the *manner* of construction of the building was a nuisance, in particular because in various respects GWU committed building code violations in the process. Assuming *arguendo* that such violations may serve to establish a private nuisance, a claim of nuisance requires proof of "an interference with the interest in the private use and enjoyment of the land." *Beatty v. Washington Metro. Area Transit Auth.,* 274 U.S.App.D.C. 25, 30, 860 F.2d 1117, 1122 (1988) (citation omitted). The deposition and other evidence proffered by Dr. Kreuzer established no more than a re-

mote danger that any uncorrected defects in the construction would interfere with the enjoyment of his property, a risk too speculative to justify a trial.

**d.** Dr. Kreuzer alleged that GWU had defamed him by publishing in the school newspaper a statement by President Trachtenberg in which he "called the $10 million in damages sought by [Dr.] Kreuzer 'too much,' adding 'I think he's inhaling.'" "[W]hether a statement is capable of defamatory meaning is a question of law" for the court to determine. *Klayman v. Segal,* 783 A.2d 607, 612 (D.C.2001) (citation and internal quotation marks omitted). The trial judge found that the "inhaling" comment was not actionable because it was "clearly [an] opinion" and "rhetorical hyperbole, and any reader would have been able to tell that no actual accusation of crime was intended." Rather, "it is manifest that Trachtenberg meant that [Dr. Kreuzer] was seeking an outlandish sum of money," not that he was "smoking marijuana." This conclusion was correct. *See, e.g., Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 16–17, 20, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990) (noting line of cases "provid[ing] protection for statements that cannot 'reasonably [be] interpreted as stating actual facts' about an individual"; referencing prior decision in *Greenbelt Coop. Publ'g Ass'n v. Bresler,* 398 U.S. 6, 13–14, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970), where "the Court reasoned that 'even the most careless reader must have perceived that the word ["blackmail"] was no more than rhetorical hyperbole, a vigorous epithet used by those who considered [the real estate developer's] negotiating position extremely unreasonable'").

### 2. *Procedural claims.*

**a.** The trial judge "had ... reasonable grounds for exercising its discre-

tion" to deny Dr. Kreuzer's motion to file a second amended complaint. *Johnson v. Fairfax Vill. Condo. IV Unit Owners Ass'n,* 641 A.2d 495, 501 (D.C.1994). As the trial judge explained, the motion was made more than a year after suit had been filed, months after the close of discovery, and well after the judge had entered dispositive rulings—by dismissal or summary judgment—on "the lion's share of [Dr. Kreuzer's] case after lengthy briefing and orders." While "a judge *need not* consider the ... merits of [a proposed] amendment," *Karr v. C. Dudley Brown & Assocs., Inc.,* 567 A.2d 1306, 1311 (D.C.1989) (emphasis added), the governing standards permit him to, *see, e.g., Johnson,* 641 A.2d at 501, and the judge properly did so here, finding that the added allegations merely confirmed his earlier rulings.

■■■ **b.** Dr. Kreuzer challenges several limitations placed on the broad discovery he was otherwise permitted, but fails to show how those restrictions significantly affected his ability to present any of his claims. *See Futrell v. Department of Labor Fed. Credit Union,* 816 A.2d 793, 809 (D.C.2003). Moreover, as regarding the main limitation, the trial judge correctly permitted GWU to invoke the attorney-client privilege to shield communications between its contractor/agent, Barry Goldfarb, and the University's counsel that were made for the purpose of seeking legal advice. *See, e.g., In re Grand Jury Subpoenas,* 179 F.Supp.2d 270, 283 (S.D.N.Y. 2001); *Covington & Burling v. Food &*

*Nutrition Serv.,* 744 F.Supp. 314, 323 (D.D.C.1990).

■■■ **c.** Finally, the trial judge did not err in declining to recuse himself *sua sponte* on being assigned the case after he had taught a seminar at GWU's law school for which he had been paid. As the judge later pointed out in disclosing the matter to the parties, his involvement with the University had ended on May 15, 2003 (when he turned in his class grades),[9] ten days after Dr. Kreuzer's suit was filed and before any hearing was held in the case. Notwithstanding the judge's disclosure, Dr. Kreuzer made no motion to disqualify him until June 2004, over a year after being apprised of the facts and after the judge had dismissed all but one of his claims. Even then, the motion was unaccompanied by an affidavit or certificate of good faith, as required. *See York v. United States,* 785 A.2d 651, 654 (D.C.2001); Super. Ct. Civ. R. 63–I. Dr. Kreuzer's challenge, based on facts known to him much earlier, thus came too late. In any event, the judge's association with GWU, all but ended by the time the suit was filed and with only a conjectural possibility of being renewed, raised no appearance of bias or prejudice "sufficient to permit the average citizen reasonably to question [the] judge's impartiality." *Scott v. United States,* 559 A.2d 745, 749 (D.C.1989) (en banc) (citation and quotation marks omitted).[10] "Although a judge has a duty to recuse when required, a judge has as

---

**9.** Classes had ended on April 23, 2003, and the judge declined the University's invitation to teach the class again for the time being, citing family reasons.

**10.** As we stated in *Scott,* "even before the ... decision of the Supreme Court in *Liljeberg* [*v. Health Servs. Acquisition Corp.,* 486 U.S. 847, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988)], it was clear ... that a judge must recuse from any case in which there is 'an appearance of

bias or prejudice sufficient to permit the average citizen reasonably to question [the] judge's impartiality.'" 559 A.2d at 749 (italics deleted; citation omitted). *Liljeberg* reinforced this equation of "an appearance of partiality" with what "a reasonable person, knowing all the circumstances," would perceive to be the case. *See* 486 U.S. at 860, 108 S.Ct. 2194 (citation and quotation marks omitted).

strong an obligation not to recuse when the situation does not require." *Anderson v. United States,* 754 A.2d 920, 925 (D.C. 2000) (citation and quotation marks omitted). The judge acted properly in retaining the assignment.

*Affirmed.*