**Michael BOSTIC, Appellant/Cross–Appellee,**

v.

**HENKELS AND McCOY, INC., Appellee/Cross–Appellant.**

**Nos. 98–CV–71, 98–CV–160.**

District of Columbia Court of Appeals.

Argued Feb. 17, 2000.

Decided April 6, 2000.

David P. Sutton, Washington, DC, with whom Carmyn J. Lombardo, Langley Park, MD, was on the brief, for appellant/cross-appellee.

George B. Breen, with whom D'Ana E. Johnson, Washington, DC, was on the brief, for appellee/cross-appellant.

Before WAGNER, Chief Judge, and FARRELL and REID, Associate Judges.

FARRELL, Associate Judge:

Plaintiff (Bostic) was injured when he partially fell through plywood boards that covered a trench and served as a temporary sidewalk. The trench had been dug by defendant Henkels and McCoy, Inc. (H

& M), while performing work as an independent contractor on behalf of the Washington Gas Company. Bostic sued H & M [1] alleging that it had negligently maintained the plywood covering over the excavation. At the close of Bostic's case, the trial court directed a verdict for H & M primarily on the grounds that Bostic had not proved what duty H & M owed to him (hence had breached), nor what standard of care governed any obligation H & M had to maintain safe covering over construction trenches. We hold, to the contrary, that Bostic presented sufficient evidence to allow a jury to decide whether H & M negligently failed to maintain a safe trench covering designed as a temporary sidewalk for pedestrians such as Bostic. We therefore reverse the directed verdict.

## I.

In 1994, as part of the Green Line Metro construction, H & M was hired by Washington Gas to reposition gas lines along the new Metro construction route. As part of the work, H & M would dig trenches and sometimes cover them temporarily with 4' wide by 8' long plywood boards laid end to end to serve as temporary sidewalks.[2] On the evening of August 10, 1994, Bostic was walking home in the Columbia Heights area of Northwest Washington where H & M had a covered trench. He testified that, after stopping to talk and joke with his aunt inside a nearby courtyard, he entered Fourteenth Street and began walking toward his apartment, which required him to use the temporary plywood sidewalk covering the trench. As he described it, the plywood had been there for "several months" and was "just scattered around ... covering the trench over the sidewalk.... [T]he plywood boards ... [were] just scattered ... over top of each other." Nails were protruding from the plywood, but, in his recollection, "the edges of the plywood [had never been] fastened to the edge of the trench." Bostic walked a few steps on the plywood but then lost his footing, and one of his legs fell into the trench up to his kneecap through a hole in the covering. An eyewitness, Willie Diggins, came to his aid and saw a six to seven inch gap between two of the boards where Bostic had fallen. Diggins confirmed that the boards had nails sticking up out of them, and he saw no safety cones, plastic taping, or caution signs in the vicinity of the trench. A supervisor for Washington Gas, called to the scene that night, testified that he "saw a lot of plywood lying around on the sidewalk ... pushed back from over the trench," covering "just one spot" of it.

## II.

Bostic called no officers or employees of H & M as witnesses, and offered no proof of the contractual agreement between Washington Gas and H & M. He likewise called no expert witness and introduced no regulations or other published standards on what constituted due care in the present setting. In directing a verdict for H & M at the end of Bostic's case, the trial court pointed first to the lack of "sufficient testimony as to ... what was required

---

1. He did not sue Washington Gas.

2. Although no one testified precisely on this point, H & M did not dispute that, as the party that dug the trenches, it also covered them over with boards when not working in them. Thus, in opening statement, counsel for H & M admitted that "[i]f we weren't completed with a particular area, we would cover the area over with plywood boards." *See Goodman v. Sears Roebuck Co.,* 129 A.2d 405, 406 & n. 1 (D.C.1957) (giving evidentiary weight to nearly identical admission); *Royall v. Weitzman,* 125 A.2d 680, 681 (D.C.1956)

(defendant's attorney "told the court [at the start of trial] that he did not dispute ... that there had been a purported foreclosure sale ... nor that plaintiff [was] the purported assignee of the purchaser at such sale"; these statements constituted "[a] ceremonial or judicial admission" of the fact of the sale and plaintiff's status as assignee of the purchaser). We note that an interrogatory answer by H & M, made part of the evidence, conceded that H & M was not contending that any other party "acted in such a manner as to cause and contribute to the occurrence" alleged.

under the contractual arrangement between Washington Gas and [H & M]," explaining that "the jury would have to speculate that it was [H & M], and not Washington Gas, who had the obligation for maintaining the covers on these trenches." Besides this perceived lack of proof that H & M (and not Washington Gas) owed a precautionary duty to pedestrians such as Bostic, the court found "no evidence upon which the jury can conclude what the proper standard [of care] would be for maintaining these [trench] covers." Finally, "assuming ... that [H & M] had any responsibility as opposed to Washington Gas in this ... case," the court found "absolutely nothing" in the evidence to show that any defects in the covering had been "called to the attention of" H & M so as to impose a duty to repair them on the defendant.

### III.

■■■ "A directed verdict is proper only if there is no evidentiary foundation, including all rational inferences from the evidence, by which a reasonable juror could find for the party opposing the motion, considering all the evidence in the light most favorable to that party." *Pazmino v. Washington Metro. Area Transit Auth.*, 638 A.2d 677, 678 (D.C.1994). Bostic argues that in directing a verdict against him, the trial court mistakenly considered the contract between Washington Gas and H & M to be the only source of any duty H & M owed a pedestrian such as himself. We agree. The duty of a contractor to take reasonable safety measures to protect the public from hazards created by its work does not stem primarily from its contractual relationship with the employer or contractee. Rather, it is a duty imposed by the common law. *See, e.g., Pastorelli v. Associated Eng'rs, Inc.*, 176 F.Supp. 159, 163 (D.R.I.1959) ("Proof of [the] contents" of contracts for work are "material and relevant" but "cannot serve to relieve the parties to those contracts of their common-law duty to exercise reason-

able care for the safety of others in the performance of their work under [the] contracts."); 64 Am. Jur. 2d *Public Works and Contracts* § 133, at 1004 (2d ed. 1972) ("Liability [of a contractor performing public works] ... is based not upon the contract with the public authorities or upon a failure to perform the work in accordance with that contract but upon the contractor's negligence and the tortious breach of duty imposed upon him by common law."). *See also* 41 Am. Jur. 2d *Independent Contractors* §§ 65, 66, at 464–67 (2d ed.1995); 65 C.J.S. *Negligence* § 95, at 1053–55 (1966). This court assumed as much in *Goodman v. Sears Roebuck Co., supra* note 2, in which the plaintiff too alleged injury from a fall on a temporary covered walkway constructed negligently by or on behalf of the defendants. The trial court directed a verdict for the defendants because no evidence established that the walkway (which might have been on public property) "was under the control of either defendant." 129 A.2d at 406. In reversing that decision, we took for granted a construction contractor's duty otherwise to exercise reasonable care toward pedestrians, and stated: "One who creates a dangerous condition is responsible for his acts regardless of legal control over the area." *Id.*

Courts elsewhere too have recognized that, regardless of its contractual arrangements, an independent contractor may be liable to the public for injuries of the sort Bostic suffered. In *Hickman v. Parks Constr. Co.*, 162 Neb. 461, 76 N.W.2d 403 (1956), for example, the defendant (Parks) contracted with the Officers Club at an Air Force Base to make improvements requiring excavation of a ditch. Hickman had attended a party at the Officer's Club and, while walking to a parking lot situated beyond the excavation site, fell into the ditch. Parks defended by asserting that the club manager (Major Morrow) was responsible for safety precautions at the excavation site. In rejecting this defense the Supreme Court of Nebraska stated:

The general rule ... which governs where a party is responsible for a dangerous place, agency, instrumentality, or operation likely to cause injury or damage to persons or property rightfully in its proximity, is that he is charged with the duty of taking due and suitable precautions to avoid injury or damage to such person or property, and his failure to take such precautions constitutes negligence.

\*    \*    \*    \*    \*    \*

This rule[,] applied to excavations[,] requires a contractor making an excavation on property of another to provide such protection as would guard persons rightfully on the property against any contingency that was reasonably to be anticipated.

\*    \*    \*    \*    \*    \*

The defendant could not be relieved from its responsibility to protect against the danger from the open excavation by reliance upon Major Morrow to protect against that danger. The person on whom the duty devolves is not excused from taking the necessary precautions by contracting with or relying on others to take necessary precautionary measures.

*Id.* at 409–10 (citations omitted). *See also Chance v. Lawry's, Inc.,* 58 Cal.2d 368, 24 Cal.Rptr. 209, 374 P.2d 185, 190 (1962) (citation and internal quotation marks omitted) ("Upon both principle and authority, it is clear that an independent contractor, who by his own negligence creates dangerous conditions during the progress of the work, should be held responsible for an injury occasioned by those conditions to one rightfully on the premises, and should be held liable for damage directly attributable to the failure to perform this duty."); *Broome v. Parkview Inc.,* 49 Tenn.App. 725, 359 S.W.2d 566, 568 (1962).

■ Regardless of its contract with Washington Gas, H & M owed a duty to pedestrians such as Bostic lawfully using the sidewalk to protect them against the hazards created by the trench and temporary covering. In this regard, its duty was like that of any "owner or *occupier* of land" to exercise "reasonable care under all of the circumstances" to "a person lawfully upon his premises." *Croce v. Hall,* 657 A.2d 307, 310 (D.C.1995) (emphasis added); *see also Smith v. Washington Sheraton Corp.,* 328 U.S.App.D.C. 367, 370, 135 F.3d 779, 782 (C.A.D.C.1998) (applying District of Columbia law) ("[A] party who operates the premises but is neither the owner nor the lessee may also have a duty of reasonable care."). *Cf. District of Columbia v. Texaco, Inc.,* 324 A.2d 690, 691 (D.C.1974) (abutting property owner making "special use" of sidewalk "owes a duty to the public to maintain the sidewalk in a reasonably safe condition and may be held liable for injuries resulting from an unsafe or dangerous condition created by such 'special use' of the sidewalk"). At the very least, any limitations H & M's contract with Washington Gas might have imposed on its ability to take reasonable precautions would be a defense; such limitations did not defeat Bostic's proof as a matter of law. *See Pastorelli, supra.*

■ The trial court also directed a verdict because of the absence of proof "of what standards [of care] should be used to cover ... trenches" like the one involved here. To the extent this entailed a conclusion that only expert testimony could supply those standards, we do not agree, at least where there was no proof of the unusual character of the trench in question or the defect alleged. When a matter falls "within the realm of common knowledge and everyday experience, a plaintiff will not need expert testimony to establish a standard and a deviation." *District of Columbia v. Shannon,* 696 A.2d 1359, 1365 (D.C.1997) (internal quotations omitted). The trench here was described (variously) as five to six board lengths or "half a block" long and three feet wide; the claimed defect was a gap of six to seven inches between boards. In our judgment, expert testimony was not needed to permit

a jury fairly to decide that leaving such a gap between boards covering a trench on which pedestrians were expected to walk was negligence, particularly in the absence of safety cones and signs or other warnings of a hazardous condition. Our decisions confirm that conclusion.

In *District of Columbia v. Shannon, supra,* for example, a young girl had her thumb torn off when it got caught in a hole in a playground slide. Concluding that a jury from its own knowledge and experience was capable of assessing the relative dangerousness of a slide, we held that the case "could have gone to the jury without expert testimony establishing a special standard of care for maintainers of playgrounds higher than the duty of reasonable care owned by any landlord to someone lawfully on the property." 696 A.2d at 1365. *See also Gerber v. Columbia Palace Corp.,* 183 A.2d 398, 399–400 (D.C.1962) (expert testimony not required on issue of whether white lines should be painted on steps to make them safer, after plaintiff fell down the steps); *Trust v. Washington Sheraton Corp.,* 252 A.2d 21, 22 (D.C.1969) (expert testimony not required on whether a slightly raised bathroom step was dangerous). We see no meaningful difference between the issue in those cases and whether H & M took adequate steps to prevent pedestrians from falling between the boards covering the trench.

■ H & M further argues that, expert testimony aside, Bostic "did not offer any municipal regulations or practices and procedures in the construction industry to provide the jury with a measure for evaluating the contractor's activities." This argument seems to us no stronger than the previous one. *See, e.g., King v. Pagliaro Bros. Stone Co.,* 703 A.2d 1232, 1234 (D.C. 1997) (proof of traffic regulations unnecessary before jury could properly decide whether driver exercised due care to avoid collision). As a leading commentator has stated:

[I]f it is within the competence of people of affairs generally to make [the] judg-

ment in a given case [that a party failed to act reasonably in the circumstances], the jury may make it even though there is no proof or statute or regulation in the case that points directly to any specific precaution that could reasonably have been taken and even though the jury themselves are not satisfied as to the precise nature of what ought to have been done. In this sense the jury need not fix or agree on a standard of conduct of precautions to be taken, but need only find that the conduct of the party falls short of *any* standard that they would agree on as reasonable.

HARPER, JAMES AND GRAY, THE LAW OF TORTS § 17.1, at 544–45 (2d ed.1986) (emphasis in original).

■ Finally, H & M argues—and the trial court agreed—that Bostic presented no evidence that H & M had actual or constructive knowledge of the defect in the covering that caused Bostic's fall. *See Marinopoliski v. Irish,* 445 A.2d 339, 340 (D.C.1982) ("[T]o make out a prima facie case of liability predicated upon the existence of a dangerous condition it is necessary to show that the party against whom negligence is claimed had actual notice of the dangerous condition or that the condition had existed for such length of time that, in the exercise of reasonable care, its existence should have become known and corrected."). This argument is foreclosed by "the strict standard of review by which we assess directed verdicts." *King,* 703 A.2d at 1234. Although there was no evidence that H & M had received actual notice of the dangerous walkway, Bostic's testimony allowed a permissible inference that it had existed for some time. He stated that the plywood had been covering the trench for "[s]everal months" and, asked what the condition of the boards was on the night of the accident, replied that "[t]hey [were] *like they always had been,* just scattered around on the—covering the trench over the sidewalk ... just scattered ... over top of each other" (emphasis added). Together with other testimony that

nails evidently designed to secure the boards to one another, or to the ground, were "sticking up out of the boards," this evidence was enough to let the jury decide whether H & M—whose workers presumably were on the construction site regularly—should have known of the gap in the boards in time to correct it. *See Hines v. Safeway Stores, Inc.*, 379 A.2d 1174, 1175–76 (D.C.1978) (citing cases and noting that constructive notice is an issue "peculiarly within the province of juries").

## IV.

 Along with the other grounds on which it moved for a directed verdict, H & M argued that Bostic had been contributorily negligent and assumed the risk as a matter of law, in light of testimony that he had told others he was walking backwards at the time of the accident and his own testimony that he was walking in an area he knew to be under construction. H & M renews these contentions as cross-appellant. On the evidence presented, the trial court concluded that both defenses presented jury questions. We agree.

Bostic had indeed told others before trial (including hospital personnel) that at the time he fell he was "walking backwards, rapidly." But he explained at trial that this had occurred before the accident, when he was leaving the courtyard of his aunt's home having jokingly snatched some money from her hand; and that he turned and was facing forward on Fourteenth Street when he stepped onto the plywood and fell. Willie Diggins also testified that Bostic was facing forward when he fell. Which of Bostic's accounts of his position at the time of the fall to believe (if either of them) was obviously a matter for the jury.

Similarly, whether Bostic was negligent in not choosing an alternate pedestrian route and instead walking over the boards in a known construction site was a factual question, given the evidence that no prohibitory or warning signs were in the area and his testimony that changing routes to his home would have taken him "two and a half blocks out of the way." *See Lynn v. District of Columbia,* 734 A.2d 168, 172 (D.C.1999). H & M likewise has not shown that Bostic assumed the risk of injury as a matter of law. *See, e.g., Dougherty v. Chas. H. Tompkins Co.,* 99 U.S.App.D.C. 348, 350, 240 F.2d 34, 36 (C.A.D.C.1957).

*Reversed.*