Steven McCOY, Appellant,

v.

UNITED STATES, Appellee.

No. 96–CF–714.

District of Columbia Court of Appeals.

Argued March 13, 2001.
Decided Sept. 27, 2001.

Kenneth D. Auerbach, appointed by the court, Silver Spring, MD, for appellant.

Catherine A. Szilagyi, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney at the time the brief was filed, and John R. Fisher and Thomas J. Tourish, Jr., Assistant United States Attorneys, were on the brief, for appellee.

Before WAGNER, Chief Judge, and TERRY and WASHINGTON, Associate Judges.

WASHINGTON, Associate Judge:

After a jury trial, appellant Steven McCoy was found guilty of assault with a dangerous weapon[1] and possession of a prohibited weapon.[2] He filed a timely notice of appeal to this court arguing that: 1) there was insufficient evidence to sustain his convictions; 2) the trial court erred in not *sua sponte* interrupting the prosecutor during his closing and rebuttal arguments because his remarks about the credibility of the complaining witness were improper; 3) the trial court erred in denying his motion to suppress his out-of-court identification by the complaining witness; and 4) that his convictions should be overturned because the trial court erred in certifying a photo array as part of the record on appeal, which was not the original photo array submitted to the trial court. We affirm.

## I.

Paige Lynette Harris was employed as a rehabilitation technician at the Washington Hospital Center in August of 1994. On August 27, 1994, Harris was walking down Georgia Avenue on her way home from work when she encountered two friends, Billy Houston and Dee Dee Woods. Harris stopped to speak with them and agreed to go with them for a visit. Harris went with Houston to an apartment building at 1000 Rittenhouse Street, while Woods went to the store. Once inside the building, Houston went to her apartment, and Harris waited for Woods on the stairwell landing between the second and third floors. There was a parade going on outside to commemorate "Georgia Avenue Day," and Harris stood by the window watching the festivities. Harris testified that the stairwell was somewhat dim, but the sun was shining outside, and the windows did not have curtains.

McCoy approached Harris and asked if she wanted to use his pipe to smoke some drugs. Harris declined, and McCoy went back up the stairs. After about a minute or two, McCoy grabbed Harris from behind, pointed a knife at her throat, and threatened to kill her. She testified that the knife was approximately seven to nine inches long with a brown handle and serrated edges. Harris testified that she did not know McCoy, but thought that he might have been attempting to rob her.

Harris began to tussle fervently with McCoy, while he continuously attempted to choke her. She testified that McCoy was pressing his thumbs to her windpipe, and she was struggling to breathe. At some point during the attack, McCoy pushed Harris down the stairs, and she bumped her head. After Harris had been struggling with McCoy for three to five min-

---

1. D.C.Code § 22–502 (1996).

2. D.C.Code § 22–3214(b) (1996).

utes, Houston came onto the landing. At this point, McCoy was lying on top of Harris, choking her. Startled by Houston, McCoy fled, and the two women ran into Houston's apartment. Harris testified that she sustained injuries, and that she treated herself.

Harris did not report her attack by McCoy, but Metropolitan Police Detective Anthony C. McGinty became aware of Harris' attack in October of 1994, during a separate homicide investigation. Detective McGinty contacted Harris, and she recounted the details of her assault by McCoy. In addition, Harris offered a description of her assailant. She described him as a black male with a dark complexion, under five feet ten inches tall, with a thin, muscular build, and missing two front teeth. Harris also informed Detective McGinty that she did not know him, but several people with whom she discussed the attack told her that his name was "Steve."

Detective McGinty met with Harris on October 6, 1994, to show her some photographs to see if she could identify her assailant. After viewing nine photographs arranged in three rows and three columns, Harris immediately identified McCoy.

## II.

*A. Evidence Insufficiency*

■ First, McCoy argues that the evidence presented was insufficient to support his convictions for assault with a dangerous weapon and possession of a prohibited weapon. Specifically, he contends that Harris' testimony was inherently incredible and that the government did not elicit the testimony of Houston, the alleged eyewitness.

■ After reviewing the record, we agree with the government that there was sufficient evidence to support McCoy's convictions. In reviewing sufficiency claims, we view the evidence and draw all reasonable inferences in the light most favorable to the government. *See Speight v. United States,* 671 A.2d 442, 454 (D.C. 1996) (citation omitted). This court defers "to the fact finder's right to weigh the evidence, determine the credibility of witnesses, and draw inferences from the evidence presented[.]" *Patton v. United States,* 633 A.2d 800, 820 (D.C.1993) (citations omitted). We do not distinguish between direct and circumstantial evidence when reviewing a sufficiency claim. *See Chambers v. United States,* 564 A.2d 26, 30–31 (D.C.1989). In fact, evidence is legally insufficient to support a conviction "only where there is no evidence upon which a reasonable mind could infer guilt." *Patterson v. United States,* 479 A.2d 335, 338 (D.C.1984) (citation omitted).

■ To support McCoy's conviction for assault with a dangerous weapon, the government must prove beyond a reasonable doubt four elements. *See Williamson v. United States,* 445 A.2d 975, 978 (D.C. 1982). First, the government must show that he made "an attempt, with force or violence, to injure another person, or a menacing threat, which may or may not be accompanied by a specific intent to injure." *Gathy v. United States,* 754 A.2d 912, 919 (D.C.2000). However, no actual injury to the victim is necessary. *See Williamson,* 445 A.2d at 978. Second, the defendant must have had "the apparent present ability to injure the victim." *Gathy,* 754 A.2d at 919. Third, the defendant must have had a "general intent to commit the act or acts which constitute the assault." *Id.* Finally, a dangerous weapon must have been used in committing the assault. *Id.* Likewise, to sustain McCoy's conviction for possession of a prohibited weapon, the government must prove beyond a reasonable doubt that the defendant possessed the weapon "with [the] intent to use it unlawfully against another." *Haynes-*

*worth v. United States*, 473 A.2d 366, 372 (D.C.1984).

 In this case, the evidence presented was sufficient to sustain both of McCoy's convictions. At trial, Harris testified that McCoy grabbed her from behind, pointed a knife at her throat, and threatened to kill her. During the attack, McCoy choked Harris and pushed her down a flight of stairs. Harris also testified that McCoy, a strong and muscular man, wielded a knife that was seven to nine inches long with serrated edges. Harris' testimony alone was sufficient to support McCoy's convictions, and the government was not required to present the corroborating testimony of Houston, whom Detective McGinty could not locate. This court has often affirmed criminal convictions based on the identification testimony of a single witness, as here, where Harris' identification of McCoy was reliable. *See Hill v. United States*, 541 A.2d 1285, 1287 (D.C.1988), and discussion *infra*. Therefore, viewing the evidence in the light most favorable to the government, the evidence was sufficient to sustain both of McCoy's convictions.[3]

*B. Government's Closing and Rebuttal Argument*

 McCoy argues that the trial court erred by not *sua sponte* interrupting the prosecutor's closing argument. Here, the alleged improper argument by the prosecutor was made in response to McCoy's attempt to discredit Harris' testimony. Harris testified that after a violent struggle lasting approximately three to five minutes, the resulting injuries did not require extensive medical treatment. The prosecutor argued in closing:

> [Harris] could have come into court and she could have testified to a lot of things, but she didn't. She testified to you-all about what happened and told you the truth. She testified to the fact of ... the injuries that occurred to her. She could have exaggerated those injuries.

In his closing statement, defense counsel argued that the jury should doubt Harris' testimony because the injuries she described were not consistent with the reported severity of her confrontation with McCoy. In response, the prosecutor argued in his rebuttal:

> Defense counsel argues that the injuries aren't severe enough. That doesn't make any sense. [Harris] could have come in here and testified to whatever she wanted. She didn't. She told you the truth. Now she's criticized because she didn't make the injuries severe enough? That's what happened. She doesn't have to apologize for not having injuries that are severe enough. She told you what they were. She didn't exaggerate them at all.

 "In evaluating appellant's contention, we must first determine whether the prosecutor's comments constituted misconduct ... Where the defense has failed to object, we will reverse his conviction only if the misconduct so clearly prejudiced his substantial rights as to jeopardize the fairness and integrity of his trial." *Irick v. United States*, 565 A.2d 26, 32 (D.C.1989) (internal citations omitted). In this case,

---

3. We also find no merit in McCoy's argument that Harris' testimony should be disregarded because some portions of her testimony were "unbelievable." The entirety of Harris' testimony was not inherently incredible, and "the jury is always free to accept parts of a witness' testimony and reject other parts."

*Payne v. United States*, 516 A.2d 484, 494 (D.C.1986). Finally, we know that judging the credibility of witnesses is the quintessential function of the finder of fact, a task reserved for the jury, and not this court. *See In re S.G.*, 581 A.2d 771, 775 (D.C.1990).

the rebuttal argument by the prosecutor appeared to be a "fair response to an attack by defense counsel on [Harris'] credibility as a witness." *See Mitchell v. United States*, 569 A.2d 177, 184 (D.C. 1990). Defense counsel's cross-examination of Harris (as well as defense counsel's closing argument) focused almost entirely on Harris' credibility, while the response to those attacks constituted only a minimal portion of the prosecutor's entire closing and rebuttal arguments. Based on our review of the record, the prosecutor's comments were a fair response to defense counsel's attacks on Harris' credibility, and thus the trial court did not need to *sua sponte* interrupt the government's closing argument. Further, even if we had found that the prosecutor's comments in closing argument constituted misconduct, which they did not, reversal of McCoy's conviction would still have been unwarranted because the circumstances of this case do not present us with a "particularly egregious" situation resulting in a clear miscarriage of justice. *See Reyes v. United States*, 758 A.2d 35, 39–40 (D.C.2000).

### C. Out–of–Court Identification Procedure

 McCoy contends that the trial court erred in denying his motion to suppress Harris' out-of-court identification because the identification was unduly suggestive. McCoy argues that the array was unduly suggestive because he had the darkest complexion and "an obviously thinner build" than the other eight persons in the array. The trial court, however, after reviewing the photo array, found it not to be unduly suggestive. Specifically, the trial court found that the complexion of the individuals in the array was not a suggestive factor, and that while McCoy may have been the darkest person in the array, all of the individuals in the array had complexions that ranged from medium to dark. We have upheld similar rulings and

see no reason to disturb the trial court's findings in this case. *See McClain v. United States*, 460 A.2d 562, 566 (D.C. 1983) (affirming the trial court's finding of no suggestibility where "appellant's complexion was the darkest" and he was one of only two individuals with a full beard). In addition, while McCoy contends that his smaller build was obvious from the photo array, we are unable to discern the individuals' stature from the pictures in the array, and thus we find his contention without merit.

 Even if we were to have found the photo array suggestive, such a finding does not necessitate reversal if the identification is independently reliable. *See Black v. United States*, 755 A.2d 1005, 1008 (D.C.2000) (expressing that the court "need not determine whether the identification was unduly suggestive in this case, as the trial court made a finding that it was reliable") (citation omitted). "In determining whether an identification was sufficiently reliable, this court has articulated five factors to be considered: '(1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witnesses' degree of attention, (3) the accuracy of his prior description of the criminal, (4) the level of certainty demonstrated at the confrontation, and (5) the time between the crime and the confrontation.'" *See id.* (citation omitted).

Here, the record reflects that Harris had a good opportunity to view her assailant, as she struggled with McCoy for three to five minutes in a stairwell well lit by sunlight. When Harris was contacted by Detective McGinty, she was able to give a detailed and accurate description of McCoy, prior to viewing the photo array. Harris was also able to describe in detail the knife McCoy used and the clothes he was wearing on the day he assaulted her. In addition, Harris identified McCoy as

the perpetrator out of the nine photographs without hesitation. Finally, at trial Harris, when questioned about her out-of-court identification of McCoy, stated confidently, "I knew what he looked like and I still know what he looks like." Therefore, the trial court's finding that under the totality of the circumstances Harris' identification of McCoy was reliable, though made six weeks after her assault, was not error. *See Neil v. Biggers*, 409 U.S. 188, 201, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) (upholding the finding of reliable identification after the lapse of seven months after the crime).

*D. Reconstructed Photo Array*

■ Finally, McCoy argues that reversal of his conviction is warranted because the original photo array viewed by the trial court during the suppression hearing was subsequently lost after the trial. Essentially, it is McCoy's contention that this court cannot conduct a meaningful review of the trial court's decision denying his motion to suppress Harris' out-of-court identification because the reconstructed photo array certified to us by the trial court is not the identical photo array originally shown to Harris.

■ Whether a reconstructed photo array permits a fair review on appeal in a case where we are called upon to make a *de novo* determination regarding both the suggestibility and the reliability of that array, is an issue of first impression in this jurisdiction. This is not the first time, however, that we have been faced with a circumstance where the record on appeal was reconstructed. In *Cole v. United States*, 478 A.2d 277 (D.C.1984), we held that while the lack of evidence in the record may interfere "with this court's duty to rule on the existence and the prejudicial nature of errors raised at trial[,]" a failure to provide certain evidence on appeal is not *per se* reversible error. 478 A.2d at

282 (citations omitted). Instead, we will "permit convictions to stand in cases where 'a fair review on appeal has not been frustrated[.]' " *Id.* (citation omitted). Thus, in deciding whether McCoy was prejudiced by the loss of the original array, an examination of the method taken to supplement "the record on appeal as a means of mitigating the negative effects of [the missing original array]" is necessary. *Id.* at 283.

Pursuant to D.C. Ct.App. R. 10(e), the government filed a motion to supplement the record with a reconstructed photo array. D.C. Ct.App. R.10 (e) provides in pertinent part:

**Correction or Modification of the Record.** Any difference as to the accuracy of the record shall be submitted and settled by the trial judge. If a material matter is misstated or omitted from the record, the parties by stipulation filed in the trial court or the trial judge upon motion by or notice to the parties, whether before or after the record is transmitted to this court, or this court may direct that the omission be supplied or the misstatement corrected. If necessary, a supplemental record shall be certified and transmitted by the Clerk of the Superior Court. All other questions as to the form and content of the record shall be presented to this court.

Thus, the rule clearly provides that the trial judge is empowered to supplement the record when necessary, and resolve any dispute as to the accuracy of that submission. This interpretation of the plain language of the statute is approved in *Cole*, where we explained that the trial court has the "ultimate responsibility to bring about an adequate record for review." *Id.* at 284. In ensuring a complete record on appeal, the trial court "may rely on its own recollection or notes from trial, or may conduct hearings and consult with

counsel and other sources" when resolving any disputes as to the content of the record. *Id.* at 284–85 (citations omitted). We also held in *Cole* that if the trial court is "satisfied that the [supplemental evidence] reflects an accurate reconstruction prepared by the best means available, the [evidence] will be added to the record on appeal." *Id.* at 285.

In this case, the trial judge held a hearing on the government's motion to supplement the record pursuant to Rule 10(e). The trial judge heard the testimony of Detective McGinty, who was responsible for creating the original array shown to Harris. Detective McGinty testified that in reconstructing the photo array in this case, he found a color photocopy that he had made of the original photo array. In addition, he located five of the original nine photos that were used in the original array. Detective McGinty further testified that he took the color photocopy of the original array to the clerk's office, and requested that copies of the four missing photos be reproduced from the negatives on file.

At the hearing, the trial judge credited Detective McGinty's testimony that the reconstructed array was "an accurate" representation of the original array shown to Harris. In addition, the trial judge found that five of the photos were the originals, that the copies of the remaining four were made from the original negatives, and that the process employed to replicate the original array was "totally trustworthy." Moreover, the trial judge found that the photographs in the reconstructed array were "either identical or materially indistinguishable from what w[ere] the original exhibit[s] at trial and that there c[ould] be no conceivable prejudice of any kind to [McCoy] from the government's failure to properly maintain the original photos." Given the trial judge's findings that the reconstructed array was "identical" to the original array and the process employed by Detective McGinty to reproduce the four missing photos was "totally trustworthy," we cannot say that the trial judge erred by allowing the government to supplement the record on appeal with the reconstructed array. *See Cole*, 478 A.2d at 284–85. Furthermore, there is no question that the reconstructed array provides this court with a sufficient record on appeal to meaningfully review McCoy's challenges to his out-of-court identification by Harris. *See id.* at 285.

### III.

Accordingly, the judgment on appeal is *Affirmed.*