Oscar S. MAYERS, Appellant,

v.

Sheila T. MAYERS, Appellee.

Nos. 01–FM–795, 03–FM–1361.

District of Columbia Court of Appeals.

Submitted April 18, 2005.

Decided Oct. 12, 2006.

Oscar S. Mayers, pro se.

Sheila T. Mayers, pro se.

Before RUIZ and REID, Associate Judges, and NEBEKER, Senior Judge.

REID, Associate Judge:

Appellant Oscar S. Mayers appeals from two orders of the trial court entered in a domestic relations case filed by appellee, Sheila T. Mayers, in the Superior Court of the District of Columbia seeking a decree of divorce and other relief.[1] The first trial court order, dated May 11, 2001, granted Ms. Mayers an absolute divorce, and resolved custody, child support, and other issues relating to the divorce. The second order, dated November 19, 2003, mainly denied Mr. Mayers' motion to terminate child support and found him in civil contempt for "willful failure to pay $12,250 in child support." Mr. Mayers makes two main arguments on appeal: (1) the trial court erred in failing to conclude that the delay in receiving the February 1, 2001 transcript of a hearing adversely affected his substantial rights; and (2) the trial judge, the Honorable Robert E. Morin, erred in refusing to recuse himself from the case due to alleged bias, and therefore all orders entered by him are void. Discerning no error, we affirm the trial court's judgment granting an absolute divorce and its order denying the motion to terminate child support.

## FACTUAL SUMMARY

The record shows that after reconciling following their 1991 divorce, Mr. and Ms. Mayers, both attorneys, married for the second time on July 17, 1994. On March 12, 1999, Ms. Mayers filed for divorce from Mr. Mayers. She was given *pendente lite* custody of Elizabeth and Gabriel Mayers, and Mr. Mayers was given *pendente lite* custody of Carolene Mayers and Robert Mayers.[2] Mr. Mayers was ordered to pay child support bi-weekly to Ms. Mayers for the children in her care.

After the temporary child custody decisions were made, the parties filed various motions in the years 1999 and 2000. One of those motions, filed by Ms. Mayers, was an October 2000, emergency supplemental motion to modify child support as well as the custody designation for Carolene Mayers, and for an award of alimony *pendente lite*. The motion indicated that Ms. Mayers' income had decreased. Mr. Mayers lodged an opposition to the motion. At a February 1, 2001 hearing on the motion, Mr. Mayers indicated that he was paying $500 bi-weekly in child support. Judge Morin increased Mr. Mayers' child support payments to $1,000 bi-weekly, retroactive to October 23, 2000, pending trial and decision on Ms. Mayers' action for divorce and related relief.

---

**1.** Mr. Mayers did not appear for oral argument. Ms. Mayers did not file a brief, but she appeared for oral argument. She claimed she had received no notices about the appeal in the year 2004. She filed a "motion to dismiss appeal, supplement the record, and remand for further proceedings," which we have granted to the extent that she has been permitted to file a responsive brief. The case was submitted, without oral argument.

**2.** Robert Mayers died on July 17, 2000, of a self-inflicted gunshot wound.

Prior to the scheduled trial on Ms. Mayers' action, Mr. Mayers filed a motion on March 8, 2001, to disqualify Judge Morin from the case, based on the judge's statements during the February 1, 2001 hearing; Mr. Mayers believed that the judge's statements revealed prejudice. In his motion, Mr. Mayers requested that Judge Morin's previous orders be vacated due to his consideration of personal knowledge outside the record, specifically that Ms. Mayers was not selected for the list of attorneys eligible to handle Criminal Justice Act ("CJA") cases. Mr. Mayers alleged that during the February 1, 2001 hearing, the trial court had taken "judicial notice that [Ms. Mayers] did nothing voluntarily to cause the los[s] of her CJA eligibility, and thus rejected [Mr. Mayers'] argument that the los[s] of CJA status was a result of [Ms. Mayers'] affiliation with her client and CJA investigator, Stanley Harris,[3] to whom she deliberately authorized CJA payments at the same time she received CJA payments to represent him as a client." Mr. Mayers also alleged that the trial judge violated Canon 3(C)(1)(a) of the American Bar Association's ("ABA") Code of Judicial Conduct.[4] On March 14, 2001, Ms. Mayers filed an opposition to Mr. Mayers' motion for recusal and to vacate child support order. Judge Morin refused to recuse himself, and trial commenced on March 19, 2001.

On May 11, 2001, the trial court docketed "findings of facts and conclusions of law and final judgment" awarding (1) Ms. Mayers an absolute divorce from Mr. Mayers; (2) both parties joint legal custody of both Elizabeth and Gabriel with primary physical custody awarded to Ms. Mayers; (3) child support from Mr. Mayers in the amount of $1,195 bi-weekly ($500 of which was ordered to be given directly to Elizabeth Mayers or the college she is attending); (4) to Mr. and Ms. Mayers each, a 50% interest in a piece of property located in Herndon, Virginia, which was ordered to be sold; and (5) to Mr. and Ms. Mayers each, a 50% interest in a timeshare property in Williamsburg, Virginia. In addition, the trial court disposed of issues related to Mr. Mayers' pension and thrift savings plan. Ms. Mayers' request for alimony was denied, but she was awarded $17,750.00 in attorney's fees.

Mr. Mayers filed notice of appeal on June 6, 2001. Subsequently, on April 16, 2002, he moved "for leave to prepare a statement of proceedings [for February 1, 2001,] in lieu of a reporter's transcript." On May 17, 2002, this court entered an order granting his motion. On June 4, 2002, Mr. Mayers submitted a proposed statement of the February 1, 2001 proceedings to the trial court. However, the statement was disapproved by Judge Morin on June 13, 2002. In response, Mr. Mayers filed a motion to reconsider the court's notice of disapproval. As a basis for his motion, he argued that he had ordered the transcript, and that the court reporter's office indicated that it could not produce it. In an order dated September 23, 2002, the trial judge stated that appellant was "correct in his statement that the court was not aware that the Court of

---

3. The trial judge referred to Mr. Harris as "James Harris."

4. Judges of the District of Columbia Courts are governed by the CODE OF JUDICIAL CONDUCT FOR THE DISTRICT OF COLUMBIA COURTS. The comparable provision to the ABA's Canon 3(C)(1)(a) is Canon 3(E)(1)(a) which provides:

(1) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:
(a) the judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of disputed evidentiary facts concerning the proceeding[.]

Appeals had directed him to prepare a statement of proceedings because of the unavailability of a transcript due to technical difficulties," and that he had received correspondence from Elizabeth Mayers advising that Mr. Mayers had not made the required child support payments ordered in her behalf. The trial court set a hearing date on these matters.

On November 14, 2002, Mr. Mayers submitted a memorandum of law, citing *Cross v. District of Columbia*, 292 A.2d 794 (D.C. 1972), and *Cole v. United States*, 478 A.2d 277 (D.C.1984), contending that the trial judge should set aside the judgment and order a new trial because there was no transcript for the February 1, 2001 hearing. Thereafter, he filed a motion to dismiss or vacate on December 9, 2002. The trial judge, in his January 27, 2003 order, stated in response to appellant's motion, "[t]he court has ordered the production of the earlier proceedings for its review to determine whether any portion of the earlier proceedings can be discerned." On May 19, 2003, Mr. Mayers filed a motion to vacate the trial judge's "findings of facts and conclusions [of] law entered May 11, 2001, an order vacating its order of February 1, 2001, and order for a new trial pursuant to the holdings of [*Cross* and *Cole* ]."

On October 16, 2003, the trial judge issued an order to show cause relating to Mr. Mayers' failure to pay child support. A hearing was held on November 17, 2003. On November 19, 2003, the trial judge issued an order finding that Mr. Mayers was "in [civil] contempt of [the] court's order due to his willful failure to pay $12,250 in child support to his daughter Elizabeth . . . ." With respect to Mr. Mayers' "assertion that the trial judge made comments during a *pendente lite* hearing that formed a basis for a subsequent motion for recusal," Judge Morin stated that "although the Office of Court Reporters initially informed the parties and the court that equipment malfunction prevented transcription of the proceedings [of February 1, 2001], it later discovered that the hearing was recorded." In the November 19, 2003 order, the court found "that Mr. Mayers' testimony in regards to the alleged statements made by the court was false. The transcript of the February 1st hearing comports with the court's memory of the hearing." The court concluded that "Mr. Mayers' testimony to the contrary constitutes an intentional misrepresentation by him in order to inject fabricated issues into the proceedings and is part of his pattern of making false statements and giving false testimony." The court found Mr. Mayers in contempt, ordered the United States Marshal to take him into custody, and committed him to the D.C. Jail "for a period of 90 days or until such earlier time as he shall purge himself of his contempt by paying . . . the sum of $12,250, or until further order of the court." The trial court stayed its order pending a hearing scheduled for January 6, 2004. Mr. Mayers filed an appeal on December 3, 2003.

## ANALYSIS

### *The February 1, 2001 Transcript Issue*

Mr. Mayers argues that the February 1, 2001 transcript is unreliable for appellate review due to numerous "inaudibles," and partial transcription. He also maintains that he was prejudiced by the two-year delay in the production of the transcript, and that the trial court should have vacated its 2001 and 2003 orders, and granted him a new trial. Ms. Mayers contends that the trial court did not abuse its discretion because of the delay in production of the transcript and properly denied Mr. Mayers' motion for a new trial.

■ This court defers to the trial court's findings of fact unless they are

plainly wrong, and reviews legal issues *de novo*. *See* D.C.Code § 17–305 (2001). Matters of discretion are reviewed for an abuse of discretion. *See Johnson v. United States*, 398 A.2d 354, 362 (D.C.1979).

Mr. Mayers relies on *Cross, supra*, and *Cole, supra*, in support of his contention that a new trial should be granted due to the errors in the transcript. In *Cross*, unlike this case, there was no transcript of the testimony taken during the trial and the parties submitted conflicting versions of a "Statement of Proceedings and Evidence." The trial judge had no independent recollection of the proceeding and thus was unable to reconcile the conflicting versions. *Cross, supra*, 292 A.2d at 794. We held that the trial court should have vacated the judgment when it could not resolve the parties' conflicting statements about the proceeding, and hence, we remanded the case for a new trial. *Id.* at 795. Mr. Mayers asserts that in the present case, as in *Cross, supra*, there are two conflicting versions of what the court said—his version and that of the trial court. He faults the trial court for relying on its version of the proceedings, and denying the accuracy of his version. He insists that the "incomplete" transcript of February 1, 2001 does not resolve the conflict, and therefore, asks this court to set aside the trial court's orders and judgments pursuant to *Cross, supra*. But *Cross* simply does not support Mr. Mayers' argument. Here, unlike *Cross*, the critical part of the February 1, 2001 transcript—pertaining to Ms. Mayers' appointment to the CJA list of eligible attorneys, and comments made by the trial judge during the February 1st hearing—was transcribed and made available to both Mr. Mayers and the trial judge.

Nor is *Cole* controlling in this case. To the contrary, *Cole* is inapplicable not only because the tape of the proceedings was found and transcribed, but also since the transcript (albeit with recognition that some parts were "inaudible"), as the trial court found, does not support Mr. Mayers' version of what happened during the February 1, 2001 hearing. In *Cole*, we declared that "in cases where there is an incomplete transcript and appellant claims that a specific trial court error merits reversal, this court will not consider the substance of the appellant's representations about the alleged error, unless the transcript supports those representations...." 478 A.2d at 284. The transcript simply does not substantiate Mr. Mayers' allegations.

The transcript of the February 1, 2001 proceedings establishes that Mr. Mayers was wrong in his assertions regarding the statements of the trial judge. Despite the fact that the transcript has many "inaudible" insertions, most of the statements of the trial judge, and the witnesses were clearly transcribed. Significantly, the pertinent parts of Ms. Mayers' testimony and the statements made by the trial judge are clear. During her testimony, Ms. Mayers stated that she was no longer on the CJA panel and no one had given her an explanation as to why she was left off the list. When counsel for Ms. Mayers attempted to explore the reasons why Ms. Mayers no longer was on the CJA panel, Mr. Mayers' counsel objected on grounds of speculation. The trial judge then said:

> I said it is speculation. You all can't talk over each other. It is speculation. [Ms. Mayers] says she doesn't know why she didn't [make the CJA Panel]. I can take judicial notice counsel that the Court issued a report as to how people got on the panel and didn't get on the panel. That was a public document and the reasons given. I also indicate that no attorney was told why they did or did not get on the panel.

In response to an inaudible question Ms. Mayers testified:

To my knowledge, I didn't know that the Court was aware that Mr. Harris was working for me and nobody has yet to say anything to me about it. I remember—what I do remember is in 1998, I got a—either a letter or a call from Judge Burgess who was the Presiding Judge, the Chief of the Criminal Division. He indicated to me that he received some kind of anonymous note or letter indicating that somebody who works for me has a criminal record.

We had a discussion about that. He said, you know, I'm not telling you what to do, but it would seem to me that he wouldn't be respected in light of his—his prior criminal record. That was—that was the sole discussion that I had with anybody regarding Mr. Harris working for me or not. And this was Judge Burgess, Chief Presiding Judge of the Criminal Division. He told me, he said, I'm not telling you what to do one way or the other. That's what he said to me. If he had said something else or additional to me, then that would have been helpful.

When another inaudible question was posed, counsel for Mr. Mayers objected and the trial court asserted:

[I'll] put on the record and the parties should know, I was one of the judges on the CJA selection panel, one of the twelve judges, and I signed-off on the report. So we ruled on each and every name whether they should make the list or not. So I was part of that deliberation and I'm prepared to represent that that had nothing to do with whether or not Ms. Mayers made the list. There was no discussion about that. I mean, that's all I can represent to you. You can accept that or not.

As shown above, the February 1, 2001 transcript provided to this court reflects that the trial judge did not make the statements alleged by Mr. Mayers regarding the committee's review of Ms. Mayers' application to be a CJA attorney. Although Mr. Harris' name came up during Ms. Mayers' testimony, nothing in the record, including the trial judge's statements, shows that Ms. Mayers was kept off the CJA Panel because of her CJA payments to her investigator, Mr. Harris, or her CJA representation of him. In sum, we cannot say that the transcript of the February 1, 2001 hearing is unreliable for appellate review.

■ Mr. Mayers also maintains that the trial judge violated D.C.App. R. 10(d)(2),[5]

5. D.C.App. R. 10(d)(2) (1999) previously provided:

The statement and each objection or proposed amendment shall be submitted by the Clerk of the Superior Court to the trial judge. Within ten days thereafter, the trial judge shall either settle and approve the statement or notify the parties that it is disapproved, stating the reasons for its disapproval. A statement approved by a trial judge shall be filed promptly and shall be included by the Clerk of the Superior Court in the record on appeal. A trial judge who disapproves a statement of proceedings and evidence may authorize the appellant to submit a revised statement. The appellant, if so authorized, shall submit a revised statement for the judge's approval within

ten days, or in lieu thereof shall order a transcript from the court reporter. If the trial judge does not authorize the appellant to submit a revised statement, or if the appellant submits a revised statement and it is disapproved by the trial judge, the appellant shall forthwith order a transcript from the court reporter.

In 2004, however, this court revised its rules to conform, wherever feasible, to the Federal Rules of Appellate Procedure. D.C.App. R. 10(d) (2006) now specifies:

*Agreed Statement as the Record on Appeal.* In place of the record on appeal as defined in Rule 10(a), the parties may prepare, sign, and submit to the trial judge a statement of the case showing how the issues presented by the appeal arose and were decided in the Superior Court. The statement must set

which he insists is "clear and unambiguous," by making him wait approximately sixteen (16) months to complete the record for appeal. He asserts that, "[t]he trial court stated it delayed or was reluctant in ruling on any of the appellant's motions or holding any hearing to re-create the record because it knew at one point a tape of the February 1st hearing existed." In his order of November 19, 2003, the trial judge noted:

Because the court knew at one point a tape of the February 1st hearing existed, the court was reluctant to hold a hearing concerning alternative ways to re-create the record. Eventually, the Office of Court Reporters discovered a tape of the hearing.

As reflected in the transcript of the hearing of March 19, 2001, when Mr. Mayers raised for the first time an allegation that the court made certain remarks at the February 1 hearing, the court listened to the tape of the earlier hearing to ensure that the allegations made by Mr. Mayers were not true.

On March 19, 2001, prior to the commencement of trial, the judge considered some preliminary matters, including Ms. Mayers' motion for sanctions due to Mr. Mayers' failure to produce certain documents, and Mr. Mayers' motion to disqualify Judge Morin, based upon statements made at the February 1, 2001 hearing. At that time, it became clear that the tape of the February 1, 2001 proceeding existed. As the trial judge asserted:

Let me put on the record ... my memory of what happened. And just to let you know that I ordered up FTR, our digital tape recording system allows us

to reinstate and listen in chambers [to] what happened. And I thought your motion did not accurately state what had occurred at that hearing. So I just wanted to be sure and I had the recording reinstated so that I was able to listen to it in chambers and explain to you from my memory of what occurred and why I made the statements I did.

Thus, as of March 19, 2001, Mr. Mayers knew that a tape of the proceedings existed, that the trial court had listened to it, and placed on the record a summary of statements regarding Mr. Harris. Once the Office of Court Reporters found the tape of the February 1, 2001 proceeding, it prepared a transcript of the tape and, according to the trial court's November 19, 2003 order, "[t]he transcript of the hearing was provided to Mr. Mayers for his review."

■ The gravamen of Mr. Mayers' argument is that the trial court should have approved his reconstructed statement of the February 1, 2001 hearing within ten days, and by failing to do so the trial court prejudiced his appeal. But, we have said "that the trial court has the 'ultimate responsibility to bring about an adequate record for review.'" *McCoy v. United States*, 781 A.2d 765, 771 (D.C.2001) (quoting *Cole, supra*, 478 A.2d at 284). In that regard, "if the trial court is not satisfied that the [proposed reconstructed] statement is accurate or as complete as possible, the court should take appropriate measures to modify it." *Cole*, 478 A.2d at 284; *see also McCoy, supra*, 781 A.2d at 772 (trial court must be satisfied that the proposed reconstructed statement "reflects

forth only those facts averred and proved or sought to be proved that are essential to the court's resolution of the issues. If the statement is accurate, it—together with any additions that the trial judge may consider necessary to a full presentation of the issues

on appeal—must be approved by the trial judge and must then be certified to this court as the record on appeal. A copy of the agreed statement may be filed in place of the appendix required by Rule 30.

an accurate reconstruction prepared by the best means available"). Here, since the trial judge had listened to the tape of the February 1st hearing, he knew that Mr. Mayers' proposed reconstructed statement was inaccurate, and consequently properly refused to approve it. Instead, the judge took the appropriate step of trying to track down the tape ("the best means available" to determine what was said at the hearing), which he knew existed, so that a transcript could be provided. Even though the tape contained "inaudibles," we conclude that a transcript of that tape suffices because "a fair review on appeal has not been frustrated[.]" *McCoy*, 781 A.2d at 771 (quoting *Cole*, 478 A.2d at 282 (internal quotation marks omitted)).

Furthermore, contrary to Mr. Mayers' argument, we do not read former Super. Ct. Civ. R. 10(d)(2) as requiring the trial court in this case to approve Mr. Mayers' proposed reconstructed statement within ten days after it was submitted to the court, even though the rule provided that: "Within ten days [after [t]he statement has been submitted], the trial judge shall either settle and approve the statement or notify the parties that it is disapproved, stating the reasons for its disapproval." [6] Under the circumstances presented here, where Mr. Mayers was made aware that the trial court would not approve his proposed reconstructed statement within six weeks of its filing, we do not believe that Mr. Mayers' was adversely impacted by the alleged 16–month delay in obtaining the transcript of the February 1, 2001 proceeding.

### The Recusal Issue

Mr. Mayers claims that Judge Morin was biased against him and should have recused himself because of personal knowl-

edge he gained from being one of the judges on the panel of judges who decided which attorneys were eligible to be on the CJA list, and Ms. Mayers was under consideration for that panel. He argues that there is an appearance of bias "on the part of any judge who [as here] was on a panel which decided that a particular lawyer would lose his/her status to earn a living under the Criminal Justice Act and is now in a position to significantly improve his/her financial condition through his presiding over the ousted lawyer's divorce and child support case."

In support of his claim, Mr. Mayers cites Super. Ct. Civ. R. 63–I(a) which states, "[w]henever a party to any proceeding makes and files a sufficient affidavit that the judge before whom the matter is to be heard has a personal bias or prejudice either against the party or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned, in accordance with Rule 40–I(b), to hear such a proceeding." He also cites *Lynn v. Lynn*, 617 A.2d 963 (D.C.1992), where the trial court based "some of its findings ... upon evidence not properly before the court...." *Id.* at 971.

▮▮▮▮ "Public confidence in a fair and impartial judiciary is essential to our criminal justice system. In order to preserve the integrity of the judiciary, and to ensure that justice is carried out in each individual case, judges must adhere to high standards of conduct." *York v. United States*, 785 A.2d 651, 655 (D.C.2001). "Thus even if there is no bias in fact, an appearance of bias or prejudice requires recusal if it is sufficient to raise a question in the mind of 'the average citizen' about a judge's impartiality." *Id.* "[T]he bias or prejudice must be personal in nature and

---

**6.** At any rate, we do not interpret former D.C.App. R. 10(d)(2) either as jurisdictional, or as an inflexible claim-processing rule. Nor have we found any case in which we declared the ten-day requirement in the former version of the rule to be either. *See Kontrick v. Ryan*, 540 U.S. 443, 454–55, 124 S.Ct. 906, 157 L.Ed.2d 867 (2004).

have its source 'beyond the four corners of the courtroom.'" *Anderson v. United States,* 754 A.2d 920, 925 (D.C.2000) (quoting *Gregory v. United States,* 393 A.2d 132, 142 (D.C.1978) (citations omitted)).

▮▮▮ Super. Ct. Civ. R. 63–I(a) requires "a sufficient affidavit" showing the alleged personal bias or prejudice on the part of the judge. "When the affidavit is 'sufficient' under the rule, a judge must recuse himself or herself from the case." *York, supra,* 785 A.2d at 654 (citing Rule 63–I(a)); *In re Evans,* 411 A.2d 984, 994 (D.C.1980)). "[B]ecause the disqualification of a trial judge may disrupt and delay the judicial process, affidavits of bias are strictly scrutinized for form, timeliness and sufficiency." *Id.* "[T]o be disqualifying, the alleged bias and prejudice must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." *In re Bell,* 373 A.2d 232, 233 (D.C.1977) (citation and internal quotation marks omitted). Super. Ct. Civ. R. 63–I(b) requires that the affidavit specified in Rule 63–I(a) "be accompanied by a certificate of counsel of record stating that it is made in good faith. The affidavit must be filed at least 24 hours prior to the time set for hearing of such matter unless good cause is shown for the failure to file by such time." Mr. Mayers maintains that he filed his affidavit on March 10, 2001, but that for some reason it is missing from the official record. A supplemental record on appeal contains a non-notarized copy of his affidavit.

▮▮▮ There are at least two problems with Mr. Mayers' argument. First, his motion "was procedurally deficient." *York, supra,* 785 A.2d at 653; *see also* *Kreuzer v. George Washington Univ.,* 896 A.2d 238, 249 (D.C.2006) ("the motion was unaccompanied by an affidavit or certificate of good faith"). "[P]rocedural deficiencies are, in and of themselves, sufficient reason for a trial judge to deny a recusal motion." *York, supra,* 785 A.2d at 654 (citations omitted). As Ms. Mayers notes, no certificate of counsel was filed indicating that appellant's affidavit, which was not submitted simultaneously with his motion for recusal, was made in good faith. Moreover, Mr. Mayers did not file his affidavit (assuming that it was properly notarized and filed) until March 19, 2001, more than 5 weeks after he knew of the alleged reason for recusal (the trial judge's comments on February 1, 2001), and only approximately one week before trial. The affidavit also was lodged after Mr. Mayers' motion to continue trial had been denied, and the trial court had ordered him "to produce the documents requested" by Ms. Mayers as part of her discovery efforts. Thus, the timing of his motion is suspect and may not meet the requirement of timeliness.[7] "[A]ffidavits of bias are strictly scrutinized for ... timeliness...." *York, supra,* 785 A.2d at 654. As the trial court stated during preliminary matters on the day of trial, March 19, 2001:

> [T]his [recusal] motion comes fairly late ... after a series of motions that goes back a while that I needed to rule on, without objection from either side. And then once the ruling was made, the motion was filed. It has a certain appearance. Why wasn't this motion filed ... prior to me filing a decision on other matters?

▮▮▮ A judge has an obligation not to recuse himself when it is not required. *Kreuzer, supra,* 896 A.2d at 249–50.[8]

---

7. Counsel for Mr. Mayers attributed the timing of the filing to the time needed "to research the issue," and to "a number of ... hotly contested issues" in the case.

8. In *Kreuzer, supra,* a case in which GWU was a party, the court held "the trial judge did not err in declining to recuse himself *sua sponte* on being assigned the case after he had taught a seminar at GWU's law school for which he

Therefore, Judge Morin properly scrutinized Mr. Mayers' recusal motion for timeliness by examining it within the context of other pre-trial events.

 Not only was Mr. Mayers' motion procedurally deficient and the timing of it suspect, but his affidavit was not "sufficient" to show "personal bias or prejudice" on the part of the judge, under Rule 63–I(a). We "strictly scrutinize[]" the affidavit "for ... sufficiency." *York, supra,* 785 A.2d at 654. After recounting what he thought he heard Judge Morin state during the February 1, 2001 hearing ("I heard Judge Morin say something to the effect...."), Mr. Mayers' affidavit states that the judge's personal bias or prejudice is traceable to his membership on the CJA Panel committee:

> The Judge further mentioned that the reasons why Ms. Mayers was not selected could be found on a document with her name and the reasons listed along side of it. Judge Morin then stated that Mrs. Mayers' los[s] of CJA case appointment eligibility was involuntary, then proceeded to increase the child support award based on her los[s] of CJA income. I had no knowledge of what occurred during the discussions of the panel of judges deciding CJA attorney appointment eligibility since it was not a public proceeding.
>
> Judge Morin's findings were based on facts not in evidence produced at the hearing. Furthermore the findings that her los[s] of CJA income was through no fault of her own is not supported by the record.

"[A]ppellant must provide some factual basis for the motion." *York, supra,* 785 A.2d

at 654 n. 6. In ruling on Mr. Mayers' recusal motion, Judge Morin stated:

> I'm inclined to deny the motion to recuse for the reasons stated. I indicated I made those statements so that, as I indicated, I had to make the final decision concerning who was on the rolls and who was not on the roll. It was an advisory committee to the Chief Judge. You know I don't know what his reasons were other than what he stated in his addendum to the list. I don't believe I cut off any evidence concerning this matter. As indicated in the opinion, I made my decision based on the evidence before me and did not base the decision on any prior knowledge.
>
> . . . .
>
> I think I made essentially two statements concerning this matter. Number 1, I had no previous communication on the matter. Number 2, neither the committee nor the Chief Judge indicated the reasons for an appointment of an attorney ... to the list. And, number 3, I think in my written order, I indicated that the Court's finding, based on the evidence, was that her removal from the panel was not voluntary ... in the sense that she did apply to become a member of the panel and did not voluntarily remove herself from it. I meant nothing more than the statement itself....
>
> [T]he affidavit is incorrect, is factually incorrect as to what I stated at the last hearing. I don't have any outside information. And I represented that to the parties. Based on that, I'll deny the motion [to recuse].

Our review of the record convinces us that Mr. Mayers' affidavit did not have a

---

had been paid." *Id.* at 249. This court held that "the judge's association with GWU, all but ended by the time the suit was filed and with only a conjectural possibility of being renewed, raised no appearance of bias or prejudice 'sufficient to permit the average citizen reasonably to question [the] judge's impartiality.' " *Id.* (quoting *Scott v. United States,* 559 A.2d 745, 749 (D.C.1989)).

sufficient factual basis to demonstrate personal bias or prejudice on the part of the trial judge, or that he based his decision in the Mayers' case on personal knowledge or observations. Judge Morin's May 11, 2001 "findings of facts and conclusions of law and final judgment" reveal that he based his child support award on such factors as "Ms. Mayers' increased income and potential income," the fact that Elizabeth Mayers "will soon be leaving for college" (Mr. Mayers was ordered to pay "$500.00 bi-weekly either directly to Elizabeth or her college)," the Child Support Guidelines pertaining to "the appropriate level of support of a non-custodial parent," and the cost of Gabriel Mayers' private school (Mr. Mayers was ordered to pay "$695.00 bi-weekly" to Ms. Mayers for child support of Gabriel).[9] The order included two pertinent footnotes. Footnote 32 stated in part: "Attribution of $40,000 annual income to Ms. Mayers was an estimate of her annualized income, because since being dropped from the Criminal Justice Act Appointment Panel, her income has been sporadic." However, footnote 33 stated that "Ms. Mayers' future prospects for earnings potential have apparently considerably brightened," based on CJA payments, appointments in juvenile cases, temporary legal work, and "her expectation ... that she will receive full-time employment in the near future." Clearly the

court's order reflected neither personal bias nor prejudice against Mr. Mayers. Nor can we say that Judge Morin's child support award was based on the type of extrajudicial personal knowledge on which the trial judge relied in *Lynn, supra,* to conclude "that the appellant could not qualify for a loan of $110,000 in spite of a statement from a lending institution that he so qualified." 617 A.2d at 971. In short, Judge Morin did not rest his child support award on "personal knowledge of disputed evidentiary facts concerning [the Mayers' divorce, custody and child support] proceeding." DISTRICT OF COLUMBIA CODE OF JUDICIAL CONDUCT, Canon 3(E)(1)(a).[10] Indeed, in revealing his role relating to the internal judicial CJA panel, Judge Morin acted in accordance with the commentary to Canon 3(E)(1): "A judge should disclose on the record information that the judge believes the parties or their lawyers might consider relevant to the question of disqualification, even if the judge believes there is no real basis for disqualification."

■ In sum, we are satisfied, even assuming Mr. Mayers' recusal motion was not procedurally deficient, that the trial judge did not err in refusing to recuse himself from this case. The trial judge did not base his decision on extra-judicial knowledge, nor was there an appearance

---

9. Notably, the order that Mr. Mayers pay a total of $1,195 bi-weekly in child support ($500 bi-weekly to Elizabeth or her college and $695 bi-weekly to Ms. Mayers for Gabriel) was only $195 higher than the $1,000 bi-weekly payment ordered at the February 1, 2001 hearing. And, based on the information presented to the trial court prior to the February 1, 2001, hearing, the increase in Mr. Mayers' bi-weekly child support payments, at that time, from $500 bi-weekly to $1,000 bi-weekly was not arbitrary; rather, it was reasonable.

10. In *Scott, supra,* note 8, 559 A.2d at 748 (D.C.1989), we said: "Canon 3(C)(1) of the [ABA] Code of Judicial Conduct provides in

relevant part: 'A judge *should* disqualify himself in a proceeding in which his impartiality *might reasonably be questioned.*'" (emphasis in original) (quoting the ABA CODE OF JUDICIAL CONDUCT Canon 3(C)(1)). According to *Scott,* the necessity of recusal is evaluated by "an objective standard," which "is required in the interests of ensuring justice in the individual case and maintaining public confidence in the integrity of the judicial process which depends on a belief in the impersonality of judicial decision making." *Id.* at 749 (quoting *United States v. Nobel,* 696 F.2d 231, 235 (3d Cir.1982), *cert denied,* 462 U.S. 1118, 103 S.Ct. 3086, 77 L.Ed.2d 1348 (1983)) (internal quotation marks omitted).

of, or actual bias. *See Liljeberg v. Health Servs. Acquisition Corp.,* 486 U.S. 847, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988); *see also Liteky v. United States,* 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994) ("[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute bias for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible."). "[T]o be disqualifying, the alleged bias and prejudice 'must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case.'" *In re Bell, supra,* 373 A.2d at 233 (quoting *United States v. Grinnell Corp.,* 384 U.S. 563, 583, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966)). Any trial judge involved with this case would have known that appellee lost her eligibility to obtain CJA appointments. This knowledge, gained within the walls of the court, by itself is not enough to require a judge to recuse himself: "[A] judge may have personal experience with particular parties who have appeared before [him] in previous cases, or [he] may have learned about underlying events by presiding over related trials. Yet such prior knowledge does not, by itself, generally raise questions about the fairness of a judge." *Clifford v. United States,* 329 U.S.App. D.C. 1, 5–6, 136 F.3d 144, 148–49 (1998) (citing *Liteky v. United States,* 510 U.S. 540, 550–51, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994)). On this record, we are confident that Judge Morin's "impartiality [could not] reasonably be questioned." DISTRICT OF COLUMBIA CODE OF JUDICIAL CONDUCT, Canon 3(E)(1); *Kreuzer, supra,* 896 A.2d at 249. Furthermore, we are satisfied that any "opinions formed by [Judge Morin] ... [did not] display a deep-seated favoritism or antagonism that would make fair judgment impossible," *Liteky, supra,* 510 U.S. at 555.

Accordingly, for the foregoing reasons, we affirm the trial court's judgment granting an absolute divorce and its order denying the motion to terminate child support.[11]

*So ordered.*

11. Mr. Mayers also challenges the trial court's findings concerning their Herndon, Virginia marital home, but we see no reason to disturb those factual findings where Mr. Mayers relies only on the parties' "initial pleadings" in the case. In its May 11, 2001 "Findings of Fact and Conclusions of Law and Final Judgement," the trial court noted that "[t]he parties purchased the [Herndon] property in January 31, 1995 with marital proceeds," and stated that: "The parties do not dispute that the Herndon property, Mr. Mayers' pension and thrift savings plan and the timeshare are marital property," only "how, if at all, the property should be distributed." Mr. Mayers also maintains that the trial court erred with respect to its "award of interest in the property [located in Virginia] and ordering a sale without follow[ing] the applicable law in Virginia...." However, properly read, the court's order of May 11, 2001 "'determine[d]' and 'adjudicated[d]' the couple's rights to [the Herndon] property." *McGean v. McGean,* 339 A.2d 384, 386 n. 1 (D.C.1975) (citing *Argent v. Argent,* 130 U.S.App. D.C. 46, 396 F.2d 695 (1968)); *see also Quarles v. Quarles,* 353 A.2d 285, 287–88 (1976) ("Although the ... decree was ineffective to accomplish a transfer of title to the appellee by its own force since both properties were located outside the District of Columbia, it was effective as a determination of property rights as between the parties.") (footnote and citation omitted).